**ATLANTIC & GULF STEVEDORES, INC., Plaintiff-Appellant,**

v.

**M/V GRAND LOYALTY, in rem, and Loyalty Shipping Corporation, Defendants-Appellees.**

No. 77-2173.

United States Court of Appeals, Fifth Circuit.

Dec. 13, 1979.

Brunswick G. Deutsch, New Orleans, La., for plaintiff-appellant.

Walter Carroll, Jr., New Orleans, La., for defendants-appellees.

Before GODBOLD, HILL and POLITZ, Circuit Judges.

POLITZ, Circuit Judge.

Plaintiff-appellant, Atlantic & Gulf Stevedores, Inc. (A & G), appeal a decision denying maritime liens against the M/V *Grand Loyalty* for certain stevedoring services rendered. A & G sought liens for sums owed for: (1) opening and closing the hatches, (2) use of a shore crane when the vessel's winches failed, and (3) delay time, detentions, caused by presence of water and ammonia in the holds. The district court allowed the liens for the crane expenses and for detentions beyond the first three days. Applying the principle of *stricti juris,* it disallowed liens for expenses of opening and closing the hatches and the first three days of detentions. We reverse.

A & G, a Louisiana corporation engaged in the business of master stevedoring, contracted with National Phosphate Corporation (National) to receive, bag and load a shipment of phosphate onto the M/V *Grand Loyalty* at A & G's Desire Street facility in New Orleans. Under this contract, a straight time rate was charged. Such a rate is based on the assumption that stevedoring operations will proceed without delay. Should there be a need for additional services, A & G routinely bills the person it considers to be the appropriate party.

National paid for all services covered by its contract with A & G. At issue is the claim against the owners for stevedoring expenses incurred for additional services.

The *Grand Loyalty* was owned by Loyalty Shipping Corporation, a foreign corporation. Sea King Corporation (Sea King), whose president, James Y. S. Chen, was located in New York, was the vessel's chartered owner/disponent. The vessel was time chartered by International Commodities Export Corporation (International).

On July 27, 1973, the notice of tender of readiness was accepted on behalf of International by A & G from Peter Toft, the *Grand Loyalty's* local agent in New Orleans. From July 30, 1973, to August 10, 1973, A & G performed stevedoring services aboard the vessel.

At the outset of the stevedoring operations, Joseph Malussa, the A & G terminal superintendent, offered the chief officer of the *Grand Loyalty* the option of having the ship's personnel open and close the hatches or having A & G perform the task on the ship's account. The chief officer indicated that A & G employees were to perform this job. The master of the vessel was not then present.

Delays in loading the cargo were encountered when the *Grand Loyalty's* winches failed. Mr. Malussa received authorization from Mr. Toft to employ a shore-based crane which was first used on August 6, 1973. Unfortunately, other problems were encountered from the very beginning of the loading due to *Grand Loyalty* equipment breakdowns and the presence of water and ammonia fumes in some of the holds. As additional charges accumulated, Mr. Malussa notified the chief officer and Mr. Toft. By the third day, Mr. Chen spoke via telephone with Mr. Malussa, directing him to keep Mr. Toft informed of the accruing charges.

When the detention charges continued to mount, Joseph W. Harper, an A & G manager, contacted both Messrs. Toft and Chen. Mr. Toft told Mr. Harper he did not have the money, a clear indication he was not prepared to advance those sums on behalf of the owner. Mr. Chen however, said that the funds would be forthcoming but they never arrived.

The district court allowed A & G's claims for $4,103.48, disallowing $12,919.51. Appellant urgently submits in brief and oral argument that the legal issues involved far exceed in importance the actual sums involved.

The instant dispute is resolved by resort to and application of the statutory maritime lien provisions, 46 U.S.C. §§ 971 et seq.:

§ 971. Persons entitled to lien

Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall

have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

§ 972. Persons authorized to procure repairs, supplies and necessaries

The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in the possession or charge of a vessel shall have authority to bind the vessel.

§ 973. Notice to person furnishing repairs, supplies, and necessaries

The officers and agents of a vessel specified in subsection Q [46 U.S.C. § 972] shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel.

We, perforce, must focus on the meaning of "any person to whom management of the vessel at the port of supply is intrusted.", § 972; "person authorized by the owner," § 971; and "other necessaries", §§ 971 and 972.

If the chief officer of the *Grand Loyalty* possessed the management powers envisioned by the statute, he had presumed authority to act. If that is so, a maritime lien is appropriate for expenses incurred when A & G workers opened and closed the hatches.

Few cases address this specific issue, and none provides a precise test for determining what constitutes sufficient managerial powers.[1]

Some guidance is provided by *Dampskibsselskabet,* 310 U.S. at 279, 60 S.Ct. at 943:

> We think that the purpose of the statute is not properly served by construing the term "management of the vessel" as referring to her "navigation." Management is a broader term connoting direction and control for the purposes for which the vessel is used.

■ Several factors in the instant case plainly support the conclusion that the chief officer is a "person to whom the management of the vessel" is intrusted, within the meaning of § 972. He is second in command only to the master. His duties specifically include direction and control of loading and unloading. Mr. Malussa has been in the stevedoring business for 30 years, four with A & G, and it had been his unvaried practice to approach the chief officer for instructions on opening and closing the hatches. This activity is a routine part of the loading operation, subject to the supervision of the chief officer with the master being contacted only if problems arise. In light of such long standing custom and tradition, which is not the subject of contest herein, we find that the chief officer acted within his actual as well as presumed authority when he requested A & G stevedores to open and close the hatches.[2]

Relying on the principle of *stricti juris,* in its statutory interpretation, the district court denied the lien for the hatch openings and closings.

It is, of course, nigh onto hornbook law that maritime liens are to be strictly construed, i. e., they are not to be lightly

1. *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.,* 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197 (1940). See also *Hercules Co. v. The Brigadier General Absolom Baird,* 214 F.2d 66 (3rd Cir. 1954); *National Bank v. Enterprise Marine Dock Co.,* 43 F.2d 547 (4th Cir. 1930); *Jan C. Uiterwyk Co., Inc. v. MV Mare Arabico,* 459 F.Supp. 1325 (D.Md.1978); *Shaw v. 46-Foot Chris-Craft Camelot,* 391 F.Supp. 1026 (W.D.Wash.1975); *The F. S. Loop,* 63 F.Supp. 105 (S.D.Cal.1945); *The Eastern,* 257 F. 874 (D.Mass. 1919).

2. While the district judge very ably made findings of fact, he did not make findings based on uncontroverted testimony pertinent to our present determination. In the absence of such findings, but where uncontroverted testimony in the record covers the issue in question, we may make findings and reverse. *Oil Screw Noah's Ark v. Bentley & Felton Corp.,* 322 F.2d 3, (5th Cir. 1963). See also *9 Wright & Miller, Federal Practice and Procedure:* Civil § 2585, p. 735.

extended by construction, analogy or inference for they operate to the prejudice of general creditors and purchasers without notice. *Vandewater v. Mills, Claimant Steamship Yankee Blade,* 60 U.S. (How.) 82, 15 L.Ed. 554 (1856); *In Re Admiralty Lines, Ltd.,* 280 F.Supp. 601 (E.D.La.1968), aff'd., *Admiralty Lines, Ltd. v. Cooper Stevedoring of Louisiana, Inc.,* 410 F.2d 398 (5th Cir. 1969). It is abundantly clear that new types of maritime liens may not be created; however, it appears equally clear that the doctrine of *stricti juris* does not affect the mechanics of the imposition of traditionally recognized varieties of maritime liens.[3] Provision of necessaries for a vessel is a long recognized basis for a lien.[4] Stevedoring services are categorized as "necessaries[5]".

We are of the further opinion that § 971 et seq. is not to be viewed through the constricting glass of *stricti juris,* or as some would suggest, *strictissimi juris.* We view the legislative history of these sections to mandate a more liberal application than that which existed prior to the 1971 amendments to the Maritime Lien Act. Our review leads us inexorably to the conclusion that it was the intent of the Congress to make it easier and more certain for stevedores and others to protect their interests by making maritime liens available where traditional services are routinely rendered. See *Nacirema Operating Co., Inc. v. S. S. Al*

*Kulsum,* 407 F.Supp. 1222 (S.D.N.Y.1975). Congress addressed this issue when it amended the Maritime Lien Act and deleted the second clause of § 973[6] which had allowed "no lien" provisos in charter contracts. Previously even where the presence of "no lien" contracts between owners and charterers was not expressly known to materialmen, they were prevented from asserting liens against vessels which they had serviced. Prior to the 1971 amendments, materialmen, unable as a practical matter to ascertain the existence of "no lien" provisions, frequently had no meaningful way to recover for their materials and services. Speaking to the desired aim of the 1971 amendments, the House report concludes:

> Granting the materialman a lien encourages the prompt furnishing of necessaries to vessels so that they can be speedily turned around and put to sea. This is especially significant today when the emphasis on vessel performance is reduced port time and increased speed. H.Rep. No. 92–340, 92nd Cong., 1st Sess., *reprinted in* (1971), U.S.Code Cong. & Admin.News, pp. 1363, 1365.

Appellee argues that the 1971 amendments were intended only to abolish "no lien" provisions. We disagree, believing such contracts to be a primary concern of the amendments but not the only matter of interest.[7]

---

3. Appellee *Grand Loyalty* refers us to *Admiralty Lines* as authority for the application of the *stricti juris* rule in the present case. Reliance on *Admiralty Lines* is misplaced for in that case the court simply rejected the stevedore's attempt to have the court recognize a new type of maritime lien covering subfreights.

4. *Piedmont Coal Co. v. Seaboard Fisheries Co.,* 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920).

5. *Cooper Stevedoring of Louisiana, Inc. v. Pappadakis,* 363 F.2d 352 (5th Cir. 1966).

6. The deleted clause provided:
> [B]ut nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or oth-

er necessaries was without authority to bind the vessel.

7. We note the following excerpts from the legislative history in 1971 U.S.Code Cong. & Admin.News, pp. 1364–65:
> The accepted practice of a "prohibition of lien" clause in a charter party and the above provision in Subsection R of the Ship Mortgage Act have created serious problems for American materialmen. Testimony at the hearings on the bill would indicate that this problem is primarily encountered with foreign-flag vessels chartered to foreign operators. In order to protect themselves, the American materialman must ascertain whether a vessel requesting necessaries is under charter and if so, whether the charter contains a "no lien provision". Alternatively, he can make a credit check on the financial responsibility of the vessel operator. Generally, a vessel requiring necessaries is

To accept the position of appellees and deny A & G the lien for opening and closing the hatches, applying the *stricti juris* doctrine as done by the district court, would, in our view, stymie congressional intent and have an unnecessary chilling effect on the free flow of commerce, adversely affecting people acting in good faith under demanding time constraints. We are not prepared to impede international commerce by forcing stevedores, in order to protect their interests, to abandon customary time conscious operating procedures and pursue a cumbersome process of searching for the "anointed" employee. Reason must rule in the affairs of mankind.

■ The district court accepted the appellee's further contention that no lien should be granted for the extra charges accrued for the first three days of detention. This is based on a perceived requirement of prior authorization. The district court interpreted § 971 to require prior authorization, a position consistent with the *stricti juris* construction given by the district court. We do not believe, however, that the sequencing of events is sacrosanct to the securing of the protections of a lien

in a case as is here presented. Prior authorization is not an essential to preserving a lien position. We are cited to no authority in support of this interpretation. We reject same. Whether a lien is available must be determined by a fair consideration of the totality of the circumstances. Certainly prior authorization would be most relevant and material. But we do not interpret the provisions above cited to require prior authorization. Authorization, actual or fairly presumed, given prior to or during rendition of services, or ratified subsequent to rendition will suffice. See *Jan C. Uiterwyk Co.,* supra, which spoke to subsequent ratification as being sufficient. In light of what we discern as the congressional intent, as well as noting this court's more expansive view of § 971,[8] we must reject the overly restrictive prior authorization requirement. The lien for the first three days of detention should have been allowed as having been ratified by Mr. Chen when he asked A & G to continue their work and enigmatically assured that the necessary funds were forthcoming.

For the reasons assigned, the decision of the district court is reversed and the case is

---

unable to give sufficient notice so that the American materialman can do either, and he usually ends up assuming the risk that his bill will be paid. This has resulted in substantial losses, or in attempting to collect money due him, costly litigation. For example, your Committee heard testimony that stevedores in the San Francisco Bay area have sustained losses over the years in excess of $2 million.

\*　　\*　　\*　　\*　　\*　　\*

Your Committee gave careful consideration to this problem of American materialmen where the owner, by chartering or surrendering possession of the vessel, clothes the master thereof with at least apparent authority to bind the vessel for necessaries furnished to the vessel. The question presented was where a loss occurs in this situation, whether it should be suffered by the owner of the vessel, or the American materialman who furnished such necessaries in good faith.

\*　　\*　　\*　　\*　　\*　　\*

After careful consideration of the entire record, your Committee has concluded that, as a matter of equity, the owner should bear the loss in such a situation.

As a practical matter, the owner can more easily protect himself contractually by bonds or otherwise at the time he charters the ves-

sel, than can the American materialman who furnishes necessaries to a vessel under great economic pressure to put back to sea.

\*　　\*　　\*　　\*　　\*　　\*

The practical effect of the bill is to negate the operation of a "no lien provision" in a charter to which the American materialism [sic] was not a party and of which he has no knowledge so that he will not be precluded from acquiring a lien for his services to which he would otherwise be entitled. Enactment of the bill should have no adverse effect on responsible vessel charterers and should prove to be of great assistance to American materialmen in collecting amounts owed on necessaries furnished a vessel.

Granting the materialman a lien encourages the prompt furnishing of necessaries to vessels so that they can be speedily turned around and put to sea. This is especially significant today when the emphasis on vessel performance is reduced port time and increased speed.

8. See *J. Ray McDermott & Co. v. The Off-Shore Menhaden Co.,* 262 F.2d 523 (5th Cir. 1959); *Sasportes v. M/V Sol De Copacabana,* 581 F.2d 1204, (5th Cir. 1978).

remanded for entry of judgment in favor of appellant for $12,919.51, plus any appropriate interest and costs.

REVERSED AND REMANDED.