**TTT STEVEDORES OF TEXAS, INC.**

**v.**

**M/V JAGAT VIJETA, in rem and Dempo Steamships, Ltd., Kontizanis Shipping, Inc., and Clay Bridge Shipping, Inc., in personam.**

**Civ. A. No. B–79–171–CA.**

United States District Court,
E. D. Texas,
Beaumont Division.

March 12, 1981.

Robert Eikel, Eikel & Davey, Houston, Tex., for plaintiff.

F. L. Benckenstein, Benckenstein, McNicholas, Oxford, Radford, Johnson & Nathan, Beaumont, Tex., for M/V Jagat Vijeta and Dempo Steamships, Ltd.

Bryan J. McGinnis, McGinnis, Holmes & Adams, Beaumont, Tex., for Kontizanis Shipping, Inc. and Clay Bridge Shipping, Inc.

## MEMORANDUM OPINION [1]

JOE J. FISHER, District Judge.

TTT Stevedores of Texas, Inc., brought this admiralty suit to recover unpaid stevedoring charges incurred during the loading of flour on the M/V Jagat Vijeta in Beaumont and Orange, Texas, from February to March, 1979. The defendant Dempo Steamships, Ltd., is the owner of the Jagat Vijeta and chartered the vessel to defendant Clay Bridge Shipping, Inc., for a trip from the U.S. Gulf to Egypt under a New York Produce Exchange form of time charter.

During the trial of the case, the Court permitted TTT Stevedores to file an amended complaint asserting a cause of action for damages against Clay Bridge, the charterer, and gave Clay Bridge sixty days to defend. The defendants asserted cross-claims against each other, and the dispute between Clay Bridge and Dempo is the subject of an arbitration otherwise unrelated to this suit. Dempo filed a counterclaim for wrongful seizure of the Jagat Vijeta. A second hearing was held (phase II of the trial) for the purpose of receiving additional evidence of plaintiff's damages, hearing the defense of Clay Bridge, and receiving evidence of damages for the wrongful seizure of the vessel.

## I. THE FACTS

Clay Bridge, having chartered the Jagat Vijeta from Dempo, appointed Kontizanis Shipping, Inc., of Pireaus, Greece, as its agent for the purpose of contracting for stevedoring services for the voyage from the U.S. Gulf to Egypt. The purpose of the voyage was to transport 28,483 metric tons of bagged flour. Kontizanis, acting as agent for Clay Bridge, requested and received bids for stevedoring services from several U.S. stevedores. One of those bids, and Kontizanis' acceptance thereto, constitutes the contract in issue. On December 22, 1978, Kontizanis sent a telex to TTT Agencies, nominally not a party to this suit, inviting a quotation. TTT Agencies responded with a quotation of prices at various Gulf ports. On January 4, 1979, Kontizanis indicated that the cargo would be loaded at Orange and Beaumont, Texas, and asked for TTT Agencies' lowest bid. TTT Agencies responded on the same day with an offer to load the flour for $12.40 per metric ton in Beaumont and $12.85 in Orange. The telex concluded: "[r]ates include straight time stevedoring, tallying, dunnage, pallet rental. Do not include detentions, I.L.A. guarantees, G.A.I., J.S.P. or crane hire, if required. These to be billed at cost."

On January 5, Kontizanis responded with a counteroffer of $12.00 and $12.50, including I.L.A. guarantees, J.S.P., G.A.I. Kontizanis also asked for an explanation of the abbreviations. TTT Agencies answered that $12.40 and $12.85 were the lowest rates.[2] On January 6, TTT Agencies received the message "[w]e agree to your stevedoring rates as per [telex of January 5]." This telex does not indicate the sender on its face. All other telex communications were between TTT Agencies and Kontizanis with no mention of Clay Bridge or TTT Stevedores. TTT Agencies appointed TTT Stevedores to load the vessel. Dempo Steamships also appointed TTT Agencies as its protecting agent in Beaumont and Orange, and on January 13, 1979, sent a copy of the charter agreement to TTT Agencies for delivery to the master of the vessel upon its arrival.

The Jagat Vijeta arrived at the Port of Orange on January 22, 1979 and tendered a notice of readiness to load cargo on January 27. Loading took place from January 31 to March 8, 1979, in Beaumont. At plaintiff's direction, the vessel's cargo loading gear was used in a "married configuration" or "union purchase" arrangement. That is,

---

1. This Memorandum Opinion constitutes the Findings of Fact and Conclusions of Law as required by Rule 52. F.R.Civ.P.

2. TTT Agencies explained that G.A.I. stands for guaranteed annual income. TTT Agencies quoted a price of ten cents per metric ton for G.A.I. J.S.P. (Job Security Program) would cost three cents per metric ton and is paid directly by the party who pays the stevedore bill.

the load was carried in a sling, using two booms for each cargo lift. It appears that the winches were locked in the lower, or slower gear at the insistence of the master of the vessel. The stevedores and Kontizanis apparently protested the use of the lower gear, and Captain Daskalakis, of Kontizanis, wrote to the master of the vessel on the second day of loading that there was a delay caused by the vessel, namely, that all the winches were operating in low gear, some were not working properly, and there was some problem opening and closing the hatches.

On February 16, TTT Stevedores sent a letter to the master complaining of the winches being operated in slow gear. On February 23, TTT Stevedores had a survey performed on the winches, which basically indicated that the winches were locked in slow gear. Plaintiff wrote to Daskalakis "[y]ou will note that surveyor confirms that winches on subject vessel are definitely slower than normal and are not operating to their full capacity. In view of this, we are therefore running 5 to 6 tons per hour under our normal loading average for subject Ports.... In order for us to break even on this extremely slow operation, we must be additionally compensated $3.05 per ton, which amount we anticipate you can recooperate from vessel owners, as vessel is not producing according to Lloyd's Highest Classification." This amount was later reduced to $2.36 per metric ton for cargo loaded at Orange, and $1.73 for Beaumont.

The next communication from TTT Stevedores to Kontizanis was a letter dated March 3, which requested additional compensation for further difficulties with the winches. TTT Stevedores estimated the additional expenses would amount to $198,084.14 for both ports, including the charge for slow winches (over $52,000.00). The remaining $145,547.77 was for "extra labor—sweat battens," detentions, overtime differentials and materials. During the trial, plaintiff was granted leave to amend its complaint to increase the ad damnum clause to $211,524.31, representing the final charges claimed to be owed.

The vessel was seized about two hours after it completed loading on March 8, 1979. It was released on a letter of undertaking at noon on March 13, 1979.

## II. LIABILITY OF THE DEFENDANTS

### A. Liability of Clay Bridge Shipping

■ Clay Bridge was the principal in whose behalf the contract for stevedoring services was made. It is undisputed that Clay Bridge paid $358,000.00 to TTT Stevedores for services received. During the second phase of the trial, TTT filed a "notice of election" to hold Kontizanis liable on the contract. Clay Bridge argues that it is relieved of liability, but that result does not obtain because the third party is not barred from holding the principal liable until he has recovered a judgment from the agent. See Lubbock Feed Lots, Inc. v. Iowa Beef Processors, 630 F.2d 250, 274 (5th Cir. 1980); Restatement (Second) of Agency, § 209.

### B. Liability of Kontizanis Shipping, Inc.

■ The telex communications that make up the contract in this case were between Kontizanis and TTT Agencies. No mention of Clay Bridge was made in the communications. Kontizanis argues, nonetheless, that it was a disclosed principal and was disclosed at or before the time that the contract was made. Kontizanis argues, based on Lake City Stevedores v. East-West Shipping Agencies, Inc., 474 F.2d 1060 (5th Cir. 1973), that it is a disclosed agent and not liable on the contract.

Critical to an understanding of Kontizanis' contentions that TTT Stevedores knew that Kontizanis was acting as agent for Clay Bridge is the relationship between TTT Agencies and TTT Stevedores. Each has an office in Beaumont, although on separate floors of the same building. Each has the same shareholders and the two companies have common officers. The Court notes that the two corporations, while legally separate entities, are confusingly intertwined. TTT Stevedores is the plaintiff in the suit, but the contract introduced in evidence was made between Kontizanis and

TTT Agencies. Often, there is a reference to "3T's" without any indication of whether TTT Agencies or TTT Stevedores is referred to. It appears that TTT Agencies was the agent for TTT Stevedores in negotiating the contract at issue. Thus, any knowledge of the agent involved in the negotiation can be imputed to the principal.

Dempo appointed TTT Agencies as the vessel's protecting agent while in Beaumont and Orange. There is no evidence as to the exact date when TTT Agencies was appointed, but there was credible testimony that TTT Agencies knew that the Jagat Vijeta was chartered to Clay Bridge prior to the time that the contract was entered into. TTT Agencies employee Garza testified that he knew that the Jagat Vijeta was chartered at the time the bid was submitted. There was also evidence that the parties had dealt with each other in similar capacities in the past, and were well aware that Kontizanis was Clay Bridge's agent. The Court finds that TTT Agencies knew that Kontizanis was acting on behalf of the charterer, Clay Bridge, and thus Clay Bridge was a disclosed principal. Kontizanis is not liable on the contract. *See Lake City Stevedores v. East-West Shipping Agencies, Inc.,* 474 F.2d 1060 (5th Cir. 1973).

Although the claim is made on a written contract, there is some possibility of recovery in quantum meruit, in that Clay Bridge, through Kontizanis, was aware of and ratified additional services provided by the plaintiff. All the services in this case were performed after TTT Agencies and TTT Stevedores had actual knowledge that Clay Bridge was the principal, and Kontizanis is thereby relieved of liability on that theory as well.

### C. Liability of M/V Jagat Vijeta and Dempo Steamships, Ltd.

The plaintiff argues that even though the vessel and its owner were not a party to the contract, they are liable for the balance due on the stevedoring account. The plaintiff contends that the extra charges were caused by defects in the vessel, *i. e.,* slow winches, and that the vessel benefited by the additional services that were rendered. The Court finds that the Jagat Vijeta and Dempo were not parties to the stevedoring contract. Any recovery must be based elsewhere. After the vessel was seized, plaintiff wrote to Dempo the only reason the vessel was seized was to recover for delays caused by the winches. Thus the vessel's and owner's liability, if any, would be negated by a finding that the winches were operated properly and were in satisfactory condition. To this subject the Court now turns.

### III. RECOVERABLE DAMAGES

The terms of the contract, as evidenced by the writings, are as follows: $12.40 per metric ton for 23,198 tons of flour loaded at Beaumont, $12.85 per ton for that loaded at Orange. The contract also provided for a charge of ten cents per ton for G.A.I. and three cents per ton for J.S.P. Thus, TTT Stevedores is entitled to at least $358,620.24 on the contract, but received $358,000.00. This includes straight time stevedoring, tallying, dunnage and pallet rental. Expressly excluded from the rate are detentions, I.L.A. guarantees and crane hire, if needed (plus G.A.I. and J.S.P. mentioned above). These additional items were to be billed at cost.

At the end of the first phase of the trial, the Court commented that the plaintiff did not make any showing that the additional charges were fair and reasonable. The plaintiff was given an opportunity to present additional evidence on damages during the second phase of the trial, but did not choose to do so. The complaint, as amended seeks a judgment of $211,523.31. This figure was obtained, presumably, from a letter written to plaintiff's counsel by TTT Agencies informing him of the status of both the TTT Agencies and TTT Stevedores account with Kontizanis. Several adjustments were made in pencil on the Exhibit. The Court surmises that the Exhibit purports to be a statement of the final charges for the services rendered by TTT Stevedores as of March 8, 1979. Plaintiff also put in evidence a letter from TTT

Stevedores to Kontizanis which lists the estimated additional expenses. These estimated expenses totalled $198,084.14 and included the following five items for both Orange and Beaumont: (1) additional remuneration for slow production because the winches were locked in slow gear ($52,-536.37); (2) extra labor, sweat battens ($25,300.00); (3) detentions ($106,299); (4) overtime differentials ($2,200.00) and (5) materials ($13,680.00). When the final charges were calculated, no breakdown was provided, so the Court is forced to use the lower estimates.

## A. Winches

■ TTT Stevedores claim that it is entitled to recover an additional amount over the contract rate because the winches were locked in slow gear. There was a considerable amount of testimony regarding the propriety of using the slow gear. Kontizanis contended from the beginning of the controversy that the vessel should be liable for the slow winches, but its present posture is that the charges are improper under the contract. As between Clay Bridge and Dempo, the liability of the vessel for slow winches must be determined in an independent arbitration proceeding.

The plaintiff cannot recover from Clay Bridge on the slow winch theory because the Court finds that the winches were properly operated in the slow speed based on all the circumstances. It was the plaintiff who chose to use the "married" configuration or "union purchase." The expert testimony of the defendants indicated that the winches should be operated at the slower speed when the union purchase is used. The slow speed should be used for various safety and efficiency reasons.

Even if the slow speed was not required for safety and efficiency, the defendants showed that any time lost in using the slow speed was minimal. The stevedores only lost on the average of ten seconds per loading cycle using the lower speed. This could not appreciably affect the loading rate.

■ Another extra charge was incurred for winches that were broken. When a winch had to be repaired, the evidence showed that the plaintiff was required to have his longshoremen stand idle, while still paying them for the time. The contract specifically allowed the stevedore to hire other cranes, if needed, and bill the stevedore at cost, but the plaintiff obviously felt that this was not necessary. The charges claimed for delay caused by broken winches come under the category of detentions, for which recovery could conceivably be allowed.

## B. Detentions

■ Detentions were not included in the per ton rate, and were to be billed to Kontizanis at cost. It appears that detentions are delays in loading, not the fault of the stevedore, during which the longshoremen are idle. Plaintiff estimated that the charges for detentions would be approximately $106,000.00. The evidence does not show what part of the $211,000.00 sought is for detentions, but it is safe to assume that it is more than the $106,000.00 estimated.

Although plaintiff is entitled to recover for some detentions under the contract, his claim fails for lack of proof. TTT Stevedores failed to show what the detentions were attributed to. Some detentions, such as those caused by broken winches or rain during loading operations, may be permissible. The plaintiff failed to show what items are normally allowed as detentions in the industry. There was no proof of the number of hours claimed for detentions, and no proof of the cost to the plaintiff. Since the burden of proof rests on the plaintiff, it cannot recover for detentions in the absence of such evidence, which would be easily obtainable from its own records. In short, merely because TTT Stevedores could not break even on their contract does not entitle them to additional compensation.

## C. Extra Labor—Sweat Battens

■ The plaintiff asks for approximately $25,300.00 (estimated) for the cost of extra labor involving the placing of sweat battens. The defendant's expert was of the

opinion that this cost should be included in the contract rate, as "straight time stevedoring." The Court finds the agreement of the parties did not contemplate this extra labor, but that it was performed. The plaintiff should recover for this extra labor on the theory of quantum meruit, as the plaintiff performed valuable services for Clay Bridge with the expectation of payment.

### D.   Materials

■ TTT Stevedores seeks $13,680 for materials (estimated). The Court finds that this item is recoverable either under the contract for stevedoring services (but not included in the fixed rate) or under a quasi-contract theory.

### E.   Overtime Differentials

■ The contract included only straight time stevedoring. This Court finds that the overtime differentials should be recoverable. TTT Stevedores is entitled to $2,200 for its estimated overtime differential expense.

### F.   Total Damages Recoverable

Clay Bridge still owes $620.24 on the contract rate. In addition, it owes $25,300.00 for extra labor involving the sweat battens, $13,680.00 for materials, and $2,200.00 for overtime differentials, or a total of $41,800.24.

### IV.   WRONGFUL SEIZURE OF THE JAGAT VIJETA

At the conclusion of the first phase of the trial, the Court concluded that Dempo Steamships, Ltd. had proved its cause of action for wrongful seizure of the vessel. The Court allowed Dempo additional time to submit proof of damages.

■ TTT Stevedores asserts that its seizure of the vessel was not wrongful because authorized by the Federal Maritime Lien Act (FMLA), 46 U.S.C. §§ 971–75, which provides that

Any person furnishing repairs, supplies ... or other necessaries, to any vessel ... upon the order of such vessel, or of a person authorized by the owner, shall have a maritime lien of the vessel, which may be enforced by suit in rem.

Stevedoring services are "necessaries." *Atlantic & Gulf Stevedores v. M/V Grand Loyalty*, 608 F.2d 197, 201 (5th Cir. 1979). "The managing owner, ship's husband, master, or any person to whom management of the vessel at the port of supply is intrusted" are "presumed to have authority from the owner to procure ... necessaries for the vessel." 46 U.S.C. § 972. The vessel was chartered by Clay Bridge, and Clay Bridge hired Kontizanis as agent to procure stevedoring services. Kontizanis, in turn appointed TTT Agencies, who appointed TTT Stevedores. In addition, Dempo appointed TTT Agencies as its protecting agent in Beaumont and Orange. The Court assumes, without deciding, that Clay Bridge and TTT Agencies are in the category of those presumed to have authority from the owner.

■ There was, however, no authority from the owner, as evidenced by the standard "no lien" provision in the charter agreement. Before the FMLA was amended in 1971, the presence of the no lien clause would have prevented TTT Stevedores from obtaining a lien, because the statute imposed on the supplier of services a duty of inquiry as to the authority. *See, e. g., Kane v. M/V Leda*, 491 F.2d 899 (5th Cir. 1974). The 1971 Amendments deleted from 46 U.S.C. § 973 a provision which imposed on lienors the duty of inquiry as to a charterer's actual authority, see P.L. 92–79, 85 Stat. 285. *See generally* G. Gillmore & C. Black, *The Law of Admiralty* § 9–46a (1975). This change has caused considerable controversy and few cases, and it is not clear whether actual knowledge, or something less, is sufficient to rebut the presumption of authority. Gillmore & Black suggest that "a materialman who neither knows or has reason to know that he is dealing with a chartered ship will be entitled to rely on the presumption of authority established by § 972. If, under all the circumstances, he has reason to know that

the ship is chartered, and makes no further inquiry, a prohibition of lien clause in the charter should be effective against him." *Id.* at 687. The Court would agree with this statement, but this is not necessary to the conclusion that no lien attached, because at the time the services were performed, TTT Stevedores had actual knowledge that the vessel was under charter to Clay Bridge. TTT Stevedores also knew the provisions of the charter, including the no lien clause, as it had received a copy of the charter agreement from Dempo.[3]

The plaintiff relies on the recent case of *Atlantic & Gulf Stevedores v. M/V Grand Loyalty*, 608 F.2d 197 (5th Cir. 1979) for the validity of its lien. That case presents a different fact situation than the case at bar. In *Atlantic & Gulf*, the services were performed at the request of the vessel's chief officer. Other claims for detentions were ratified by the owner. The question presented in the case was who had authority to bind the vessel. The court did not hold that no lien provisions were abolished absent actual knowledge, rather, it stated that "[w]hether a lien is available must be determined by a fair consideration of the totality of the circumstances." *Id.* at 202.

Furthermore, TTT Stevedores' seizure of the Jagat Vijeta was in bad faith. Not only was it aware of the no lien provision, but it knew that liability for stevedoring charges rested with Clay Bridge and Kontizanis and not on the vessel or its owner. The case of *Frontera Fruit Co. v. Dowling*, 91 F.2d 293 (5th Cir. 1937), cited by the plaintiff, is easily distinguished in that good faith was established in that case.

Therefore, Dempo is awarded (1) $29,200.00 for its loss of charter hire during the four day detention; (2) $1445.83 for fuel consumed during the detention; and (3) $2,453.23 for the cost of the bank guarantee to release the vessel, a total of $33,099.66.

3. TTT Agencies, the agent of TTT Stevedores, had knowledge of the contents of the charter because it was Dempo's local agent and Kontizanis' local agent. In addition, TTT Stevedores pressed the master of the vessel for additional funds because it alleged that the winches were not as described in the charter. The plaintiff cannot rely on the winch description clause of the charter while denying knowledge of the no lien clause.