TTT STEVEDORES OF TEXAS, INC., Plaintiff-Appellant,

v.

M/V JAGAT VIJETA, etc., et al., Defendants-Appellees.

No. 81–2233.

United States Court of Appeals, Fifth Circuit.

Feb. 4, 1983.

As Amended on Denial of Rehearing April 7, 1983.

Robert Eikel, Houston, Tex., for plaintiff-appellant.

F.L. Benckenstein, Beaumont, Tex., for defendants-appellees.

Before BROWN and RANDALL, Circuit Judges, and DUPLANTIER *, District Judge.

JOHN R. BROWN, Circuit Judge:

TTT Stevedores filed suit against the M/V JAGAT VIJETA *in rem,* and her owner *in personam* to recover unpaid stevedoring charges incurred during the loading of the M/V JAGAT VIJETA in Beaumont and Orange, Texas. Because we find that TTT Stevedores did not have actual knowledge of a "no lien" provision in the charterparty or that Kontozanis Shipping, Inc., was acting as an agent for Clay Bridge Shipping, Inc., we reverse.

*Pack-Men: The Tale of TTT Stevedores*

The M/V JAGAT VIJETA is a vessel owned by Dempo Steamships, Ltd. (Dempo). The vessel was time chartered to Clay Bridge Shipping, Inc. (Clay). Clay had appointed Kontozanis Shipping, Inc. (Kontozanis) as its agent to obtain stevedoring services for the vessel in Beaumont and Orange. Dempo had appointed TTT Ship Agencies (TTT Agencies) as its protective agent in Beaumont and Orange. TTT Agencies was also acting as agent for TTT Stevedores.

* District Judge of the Eastern District of Louisiana, sitting by designation.

As agent for Clay, Kontozanis contracted with TTT Agencies to provide stevedoring services to the vessel. TTT Agencies appointed TTT Stevedores to load the vessel. The stevedoring contract called for a tonnage rate plus certain extras such as detentions to be billed at cost.

Loading of the vessel began after notice of readiness was tendered. The stevedores directed that the vessel's cargo loading gear be used in the married or union purchase configuration. The master locked the winches into the second or slower gear. TTT Stevedores wrote the master stating that there was a delay in loading caused by the operation of the winches in a slower gear and the failure of some of the winches to work properly. TTT Stevedores had a survey performed on the winches allegedly confirming that the winches were working slowly and not working up to capacity. TTT Stevedores contacted Kontozanis several times requesting additional compensation for the difficulties with the winches.

The entire stevedoring bill was not paid. TTT Stevedores filed suit to recover the unpaid stevedoring charges incurred in loading the M/V JAGAT VIJETA against the ship *in rem* and Dempo, the owner, *in personam*. TTT Stevedores also sued Kontozanis *in personam* alleging that it was the vessel's charterer.

The actual charterer, Clay, and Kontozanis filed an answer alleging that Kontozanis acted merely as Clay's manager, and denying liability. At trial, TTT Stevedores amended its complaint to add Clay as a defendant, alleging that Kontozanis acted "as a managing agent for its principal [Clay], disclosed or undisclosed." The central issues at trial were whether TTT Stevedores knew that Clay rather than Kontozanis was the actual charterer, and whether it knew of the charter provision that no liens could be imposed against the vessel by the charterer. TTT Stevedores' Beaumont representative, Klahn, testified that he dealt solely with Kontozanis and its representative and did not know that Clay was the charterer until trial. Anderson, controller for both TTT Stevedores and TTT Agencies, also testified at trial. He testified that TTT Stevedores and TTT Agencies are separate corporations, with separate management and offices, although they have the same owners. TTT Agencies was TTT Stevedores' general agent, the agent for Kontozanis in this transaction, and the general agent for Dempo. Nothing in the record shows that comptroller Anderson knew that Clay was the charterer until after suit was filed. Anderson also expected Kontozanis to pay the bills of TTT Stevedores and TTT Agencies as charterer.

Garza, an employee of TTT Agencies, but not of TTT Stevedores, testified that as Dempo's agent he received in January of 1979 a copy of the charterparty from Dempo to be delivered to the vessel's master. Garza read the charterparty and from that was aware that it contained a no lien clause. He testified that as of January 22, 1979, he knew that Clay was the charterer but that Dempo had told him to give the charterparty only to the master, and that that was what he had done. There was no testimony that Garza ever communicated to TTT Stevedores that Clay was the charterer or that the charterparty contained a no lien clause.

Despite this evidence, the district court, 509 F.Supp. 1072, held that TTT Stevedores could not recover from Kontozanis because it was an agent for Clay, a disclosed principal of which Garza had knowledge. The court also denied TTT Stevedores recovery for delay caused by the broken winches because the contract specifically permitted it to hire other cranes if needed and to bill them at cost. TTT Stevedores having failed to do this, the court held that these additional costs were properly charges for detentions. Finally, the court held that TTT Stevedores had failed to prove that the amounts it claimed were fair and reasonable.

In addition to deciding the claims of TTT Stevedores, the court held that it was liable to Dempo for wrongful seizure of the vessel because Garza's knowledge of the no lien clause could be imputed to TTT Stevedores. On the basis of these findings, TTT Stevedores appeals.

*TTT Stevedores' Appeal: Pack-Men Piqued*

TTT Stevedores argues first that the district court erred in finding that TTT Agencies had actual knowledge of a no lien provision in the charterparty and that such knowledge could be imputed to TTT Stevedores. Second, it asserts that the district court's finding that the charterer, Clay, was a disclosed principal was clearly erroneous. Both of these inquiries are rooted in the knowledge acquired by Garza. Next, it argues that the court erred in denying recovery for the extra charges resulting from loading delays caused by the winches and in denying full recovery for the additional extra charges claimed. Finally, TTT Stevedores argues that it was error to permit the vessel owner to recover for wrongful seizure of the vessel.

A. *Knowledge of the No Lien Provision: Pack-Men Percipient?*

TTT Stevedores' first objection to the district court's decision is its denial of recovery *in rem* from the vessel and Dempo. It argues that the *in rem* statutory lien afforded the supplier of necessaries to a ship can be defeated only where it is established that the supplier has actual knowledge of the existence of a no lien provision in the charterparty. Since it asserts that there was no such knowledge here, it argues that the court's holding that the knowledge of Garza, an employee of TTT Agencies, could be imputed to TTT Stevedores was clearly erroneous.

 Determination of this issue necessarily involves three inquiries. First, it must be determined whether a maritime lien arose on the vessel. There is no question that supplying stevedoring services gives rise to a maritime lien under 46 U.S.C. § 971. *See Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.,* 310 U.S. 268, 273, 60 S.Ct. 937, 940, 84 L.Ed. 1197, 1200 (1940), A.M.C. 647, 650; *Gulf Trading & Transportation Co. v. M/V HOEGH SHIELD,* 658 F.2d 363, 368 (5th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982). Thus, a maritime lien against the vessel arose at the time of the contract for stevedoring services.

Having determined the existence of a maritime lien, we can now turn to the second inquiry necessary for the determination of this matter. Appellees, the vessel and Dempo, argue that the maritime lien against the vessel was waived by a "no lien" provision in the charterparty agreement. They suggest that there is evidence in the record that TTT Agencies had actual knowledge of the "no lien" provision and that this knowledge was imputed to TTT Stevedores. We cannot agree.

Our examination of the record reveals that the only testimony which indicates that TTT Stevedores might have had knowledge of the no lien provision was the testimony of Garza, an employee of TTT Agencies. The trial court held that since Garza had examined the charterparty agreement, he knew that Kontozanis was acting as an agent for Clay and that the agreement contained a no lien provision. Because TTT Stevedores and TTT Agencies had common owners and because TTT Agencies was also acting as an agent for TTT Stevedores, the trial court held that Garza's knowledge could be imputed to TTT Stevedores.

 If we examine Garza's testimony closely, we see that no such interpretation is warranted. Garza testified that he received the charterparty agreement on the 22d of January. Therefore, neither Garza nor TTT Stevedores can be charged with knowledge of the no lien provision or the participation of Clay before that date. The fact is, however, that the contract was made on January 6, 1979, over two weeks earlier. Thus, on the basis of the record before us, TTT Stevedores could have had no knowledge, imputed or otherwise, at the time it entered into the contract to provide stevedoring services. For that reason, we hold that the conclusion of the District Court that TTT Stevedores was liable to Dempo for wrongful seizure of the vessel because it

knew of the no lien clause is clearly errone-ous.[1]

Given the existence of a valid maritime lien, we can turn to the third inquiry necessary for the determination of TTT Stevedores' liability to Dempo. This inquiry centers on whether Dempo and the vessel have satisfied their burden of establishing that the personal credit of the owner or charterer was solely relied upon. If it was, then TTT Stevedores waived its lien and could not have lawfully seized the vessel.

▮ In *Gulf Trading*, 658 F.2d at 368, we held that under the Maritime Lien Statute, 46 U.S.C. § 971, a presumption arises that one furnishing supplies to a vessel acquires a maritime lien, and the party attacking this presumption "has the burden of establishing that the personal credit of the owner or charterer was solely relied upon."[2] To meet this burden, "evidence must be produced that would permit 'the inference that the supplier purposefully intended to forego the valuable privilege which the law accords' ...". *Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co.*, 261 F.2d 861, 867 (5th Cir.1958) *quoted in Gulf Trading*, 658 F.2d at 368. The trial court did not address this issue although Dempo and vessel do address it in their brief. We hold, however, that the evidence in the record is insufficient to permit the inference that TTT Stevedores purposefully intended to forego its maritime lien. On this basis,

1. Because we find that TTT Stevedores did not have knowledge of the no lien agreement [or of Clay's participation] at the time of the contract, we need not reach the question of whether the knowledge acquired by Garza subsequent to the contract could be imputed to TTT Stevedores. Were we to rule on this issue, however, we would have to hold that the knowledge acquired by Garza is not imputable to TTT Stevedores. Garza acquired knowledge of the Clay participation and of the no lien clause as an agent of Kontozanis and of Dempo. As such, TTT Stevedores, as principal, would not be affected by the knowledge Garza acquired. The Restatement (Second) of Agency § 281 (1957) provides: "A principal is not affected by the knowledge of an agent who is privileged not to disclose or act upon it and who does not disclose or act upon it." Garza testified that he was given the charterparty by the owners (Dempo) and that "I had to abide by their instructions. They told me to only give it to the Master and that's what I was going to do." (Record at 166). There is apparently universal agreement to the effect that where an agent's duties to others prevent him from disclosing facts to the principal, TTT Stevedores here, the principal is not bound because of the agent's knowledge. Moreover, since this knowledge did not benefit TTT Stevedores, the general exception to this rule also does not apply. Thus, we find that even if Garza had acquired knowledge of the no lien provision and of Clay's participation prior to the time the agreement was entered into, such knowledge could not be imputed to TTT Stevedores. *See* Restatement, *supra,* appendix, § 281 at 483.

2. This view represents a significant alteration of the pre-existing law in the area. Prior to 1971, 46 U.S.C. § 973 provided:

§ 973. *Notice to person furnishing repairs, supplies, and necessaries.* The officers and agents of a vessel specified in § 972 shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.

In 1971, Congress passed amendments to the Ship Mortgage Act of 1920, Pub.L. No. 92–79, 85 Stat. 285 (1971), which removed the provisions prohibiting the construction of the chapter to confer a lien in the circumstances called for. In explaining its action, the Committee on Merchant Marine and Fisheries pointed out:

The accepted practice of a "prohibition of lien" clause in a charter party and the above provision in Subsection R of the Ship Mortgage Act have created serious problems for American materialmen.... In order to protect themselves, the American materialman must ascertain whether a vessel requesting necessaries is under charter and if so, whether the charter contains a "no lien provision". Alternatively, he can make a credit check on the financial responsibility of the vessel operator. Generally, a vessel requiring necessaries is unable to give sufficient notice so that the American materialman can do either, and he usually ends up assuming the risk that his bill will be paid. This has resulted in substantial losses, or in attempting to collect money due him, costly litigation.

H.R.Rep. No. 92–340, 92d Cong., 1st Sess., *reprinted in* 1971 U.S.Code Cong. & Ad.News 1363, 1364.

**1140**

we hold that the district court erred in denying TTT Stevedores *in rem* recovery against the vessel and Dempo as claimant.[3]

### B. *Kontozanis' Principal: Pack-Men's Monster?*

Our discussion of the question of knowledge of the no lien provision effectively disposes of TTT Stevedores' second basis for appeal in which it argues that the district court's finding that Kontozanis is not liable to TTT Stevedores because the charterer was a disclosed principal is clearly erroneous. As suggested above (*see* note 1 *supra*), Garza had been instructed only to transmit the information concerning Clay's participation to the Master. Thus, because he was apparently not to disclose the information to anyone else, Garza's knowledge both of the no lien provision and of Clay's participation cannot be imputed to TTT Stevedores. Since Garza is also the only person in the available record who could have conveyed that information to TTT Stevedores, and because he did not, we hold that the district court's finding that Kontozanis was not liable because it was an agent for a disclosed principal, Clay, based on the knowledge of Garza, was clearly erroneous.

### C. *Damages for Loading Delays: Pack-Men's Poky Power Pulls*

TTT Stevedores' third basis for appeal asserts that it is entitled to recover extra charges resulting from loading delays caused by winches locked in slow gear. The court found that the winches were properly operated at slow speed. Expert testimony indicated that the winches should be operated at a slower speed when the "union purchase" or "married" configuration is used, as was the case here. The slower speed was required for safety and efficiency reasons. Moreover, the court found that even if safety or efficiency did not mandate the use of a slower speed, there was at best a minimal amount of time lost by using the slower gear. It found that the stevedores lost only

an average of ten seconds per loading cycle using the lower speed. Finally, the court denied extra charges incurred for broken winches because the contract specifically allowed a stevedore to hire other cranes if needed and bill the stevedore at cost. The stevedore failed to hire other cranes. Thus, extra charges were denied.

■ This Court has been hesitant to overturn factual determinations by the district courts. In *T.J. Stevenson & Co. v. 81,193 Bags of Flour*, 629 F.2d 338, 349 (5th Cir.1980), we held that "even in admiralty [a court] should be slow to overturn fact decisions made by the judge before whom the facts are annealed through the hammering, heating process of vigorous running advocacy." Because we find evidence in the record sufficient to sustain the district court's finding, we find no error in its denying TTT Stevedores additional charges for the operation of the winches.

### D. *Full Recovery of Additional Loading Charges: Pack-Men's Profit Apportioned*

TTT Stevedores argues as its fourth basis for appeal that the trial court erred in not allowing recovery of the full amounts it claimed in payment of stevedoring services. Initially, TTT Stevedores made no specific showing that these charges were fair and reasonable. The trial court gave it an additional opportunity to present specific evidence on damages during the second phase of the trial, but it did not do so, relying instead on its exhibits. On this basis, the court relied on the amount sought in the complaint and the adjustments made in pencil on a letter written to TTT Stevedores' counsel by TTT Agencies informing it of the status of both the TTT Agencies' and TTT Stevedores' account with Kontozanis. When it calculated the final charges and discovered that no breakdown was provided, the court was "forced" to use the lower estimates.

---

**3.** We should also point out that by so holding, we necessarily dispose of Dempo's claim for wrongful seizure of the vessel. By finding that the vessel was properly seized *in rem* on the

basis of a maritime lien, we automatically hold that the owner can have no damages against the stevedore for wrongful seizure.

Because we reverse the case on other grounds, we remand the case to award, to TTT Stevedores, with appropriate interest, the amounts due and unpaid under the contracts for stevedoring services and afford supplemental hearings to determine those amounts to the extent they are not already proved or as to which there is a genuine dispute.

E. *Wrongful Seizure: Are Pack-Men Space Invaders?*

TTT Stevedores' final basis for appeal asserts that the District Court erred in permitting the vessel owner to recover for wrongful seizure of the vessel. Because we have held that TTT Stevedores had a good lien, we find Dempo entitled to no damages for wrongful seizure.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.