**CARDINAL SHIPPING CORPORA-TION, Plaintiff-Appellant Cross Appellee,**

v.

**M/S SEISHO MARU, her engines, tackle, etc., Defendant-Appellee,**

**Aizawa Kaiun K.K., Claimant-Defendant Cross-Appellant.**

**The GOVERNMENT OF the REPUBLIC OF INDONESIA and Bandan Urusan Logistik, Plaintiffs-Appellants Cross Appellees,**

v.

**M/V GLAFKOS, her engines, tackle, apparel, furniture, etc., in rem, et al., Defendants-Appellees,**

**Glafkos Shipping Co., Ltd., Defendant-Appellee Cross Appellant.**

**Nos. 83–2338, 83–3030.**

United States Court of Appeals, Fifth Circuit.

Oct. 22, 1984.

Leach & Paysse, Philip A. Fant, New Orleans, La., Delson & Gordon, Daniel J. O'Callaghan, New York City, for plaintiffs-appellants cross appellees in No. 83–3030.

James J. Sentner, Jr., Houston, Tex., for amicus curiae, Haight, Gardner, et al. in No. 83–3030.

Chaffe, McCall, Phillips, Toler & Sarpy, J. Francois Allain, John H. Clegg, New Orleans, La., for defendants-appellees in No. 83–3030.

Haight, Gardner, Poor & Havens, James J. Sentner, Jr., Houston, Tex., R. Glenn Bauer, Haight, Gardner, Poor & Havens, New York City, for Cardinal Shipping Corp. in No. 83–2338.

Royston, Rayzor, Vickery & Williams, Ted C. Litton, William R. Towns, Houston, Tex., for Seisho and Aizawa in No. 83–2338.

Before GOLDBERG, RUBIN and REAVLEY, Circuit Judges.

GOLDBERG, Circuit Judge:

The two cases consolidated for this appeal both involve maritime liens and the effectiveness of "Prohibition-of-Lien" clauses contained in charterparties. We will treat the two cases separately, however, because they raise different peripheral issues and their factual settings differ.

## I. CARDINAL SHIPPING v. M/S SEISHO MARU

Aizawa Kaiun K.K. ("Aizawa") owns the M/S Seisho Maru. Aizawa time-chartered the vessel to Nakamura Steamship Co., Ltd., ("Nakamura") under a charterparty dated August 17, 1979. Aizawa and Nakamura are both Japanese Corporations, and the Seisho Maru sails under a Japanese flag. The charterparty gave Nakamura the right to use or sublet the vessel for a set period. The actual operation of the vessel, however, would be the responsibility of a Master and crew provided by Aizawa. On November 17, 1980, Nakamura time-chartered the Seisho Maru to Clover Trading Corporation ("Clover"), a Liberian Corporation. The period of this charter was two years, plus or minus one month at the charterer's option. The charterparty provided for payment of hire to be made in London, semi-monthly in advance.

The time charter from Nakamura to Clover, as well as the head charter from Aizawa to Nakamura, were drawn on the standard New York Produce Exchange form. Both charters contained the following lien clause:

> 18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. *Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.*

(emphasis added).

On October 5, 1981, in Charlotte, N.C., Clover entered into a voyage charterparty with Cardinal Shipping Corporation ("Cardinal"), a United States Corporation. The charter contemplated the carriage of six thousand metric tons of steel coils from Oxeloesund, Sweden, to the ports of Detroit and Chicago. Cardinal executed the

charter in order to meet its contractual commitment with a shipper of the cargo.[1]

In accordance with the charterparty, Clover delivered the Seisho Maru to Cardinal in Oxeloesund.[2] On November 3, 1981, Cardinal began loading the cargo of coils on board. In the meantime, a dispute had developed between Nakamura and Clover. Payment of hire under their time charter became due on October 28, 1981. The day before, Clover had advised Nakamura that it had instructed its bankers to transfer the amount due to Nakamura's bank. Nakamura's representatives, relying on this communication, waited several days for the transfer of funds. When the transfer had not occurred by November 3, Nakamura's representatives contacted Clover seeking clarification as to the non-payment of hire.

On the following day, November 4, 1981, Nakamura instructed the vessel that loading should cease immediately. Approximately 1800 of the 6000 metric tons had already been loaded; but neither Nakamura nor the Master of the Seisho Maru had signed bills of lading for the cargo. Since payment was not forthcoming, Nakamura gave formal notice on November 5 of the default in payment of hire, expressly reserving Nakamura's right under the charterparty to withdraw the vessel and affording Clover three banking days to cure the default.

When Clover failed to remit payment within that time, Nakamura announced that it would withdraw the vessel from the time charter. Some discussions ensued between Nakamura and Cardinal concerning the carriage of the cargo of steel coils, but no agreement could be reached. Thus, in mid-November, Nakamura discharged the cargo already on board and withdrew the Seisho Maru.

Cardinal made alternate arrangements to ship the cargo, allegedly suffering losses

as a result. It filed suit in district court to recover damages for breach of the voyage charter. Cardinal brought this action *in rem*, asserting a lien against the Seisho Maru. Aizawa appeared as claimant of the vessel and filed a Motion to Dismiss Cardinal's *in rem* complaint. Cardinal, in turn, filed an Opposition to that motion as well as its own Cross-Motion for Summary Judgment. The trial court granted Aizawa's Motion to Dismiss, holding that the Prohibition-of-Lien Clause in Aizawa's charterparty precluded Cardinal's assertion of a lien. This appeal follows.

## A. Issues

A major squall has brewed in this case because Cardinal is suing for breach of a charter to which Aizawa was not a party. Cardinal nevertheless asserts that the Seisho Maru itself is bound to that contract. Cardinal argues that ancient maritime doctrine creates reciprocal liens between the vessel and her cargo once the cargo is loaded on board. Aizawa responds that such a lien does not arise in this case and, in any event, is precluded by the Prohibition-of-Lien clause in the Nakamura-Clover charter. The shipowner argues that Cardinal had a duty of reasonable diligence to discover that clause. Finally, Aizawa argues that Swedish law should apply to this dispute under choice-of-law principles.

Approaching this storm line from the opposite heading, we hold that Swedish law does not apply but that American law precludes Cardinal's lien.

### 1. Choice of Law

This Circuit has held that the *Restatement (Second) of Conflicts of Law* [hereinafter cited as *Second Restatement*] provides the proper model for resolving maritime choice-of-law problems. *See Gulf*

---

1. The shipper is Intercontinental Metals Corporation, a United States company. Its contract with Cardinal is evidenced by a Liner Booking Note executed in Charlotte, North Carolina, on October 13, 1981. We, like the trial court, consider it irrelevant that this note is dated eight days after the voyage charter between Cardinal and Clover.

2. The charter originally designated the Dimitris P. Lemos as the carrying vessel but provided for substitution at the carrier's option. The Seisho Maru was substituted before the date of performance.

*Trading & Transportation v. the Vessel Hoegh Shield*, 658 F.2d 363, 366 (5th Cir. 1981), relying on *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254.[3] In *Gulf Trading*, an American supplier ("Gulf") had delivered bunker fuel to a vessel in American waters. Failing to receive payment from the charterer of the vessel, Gulf seized the vessel and asserted a maritime lien. This Court, in deciding whether American law should govern the validity of the lien, followed the analysis of the *Second Restatement* and evaluated the various points of contact between the transaction and the governments whose competing laws might apply.

Looking first at the bunkering contract between Gulf and the charterer, we considered the contacts specified in section 188 of the *Second Restatement*:

[I]n the absence of an effective choice of law by the parties, the forum contacts to be considered include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Gulf Trading*, 658 F.2d at 366.

We also recognized, however, that a maritime lien does not arise solely by operation of contract law. Therefore, in addition to the section 188 contacts, we considered more general factors set forth in *Second Restatement* § 6:

In the absence of statutory directives and subject to constitutional restrictions, the relevant factors include (a) the needs of the international system, (b) relevant policies of the forum, (c) relevant policies of other interested states, (d) the protection of justified expectations, (e) the basic policies underlying the particular field

of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

658 F.2d at 367.

We concluded that federal statutory law reflected a strong policy of protecting American suppliers and would lead to a uniform, predictable result in future cases. We also determined that the alternative forum (England) did not have a great interest in regulating the relationship between an American supplier and a non-English vessel. Therefore, we applied forum law rather than British law.

■ Now, directing the spyglass of precedent toward the deck of our own Seisho Maru, we likewise conclude that American law should govern. The voyage charter between Cardinal and Clover has the most significant contacts with the United States. The charterparty was executed in the United States between an American corporation (Cardinal) and a Liberian corporation (Clover). The places of performance included both Sweden, where the cargo was to be loaded, and the United States, where the cargo was to be discharged. Freight was to be paid by transferring money to a bank in New York. Disputes were to be arbitrated in New York. The only contacts with Sweden were the initial presence of the subject matter—the steel coils to be shipped—and the fact that performance began in Oxeloesund. Though the presence of the coils is an important factor, *see Gulf Trading*, 658 F.2d at 367 n. 4, we hold that the contacts with the United States predominate in this case.[4]

Furthermore, the more general factors listed in *Restatement Second* § 6 do not favor Swedish law. Sweden has some interest in the handling of cargo within its waters, but little concern about liens as-

**3.** *Lauritzen* involved a Jones Act claim brought by an injured seaman. Therefore, the Supreme Court applied the *Second Restatement* rules relevant to tort actions. *See* 345 U.S. at 583, 73 S.Ct. at 928.

**4.** It is conceivable that Japan has contacts with this case, because the owner is Japanese and the

head charter (containing one of the anti-lien clauses) was drawn up between two Japanese corporations. However, Aizawa has not contended that the trial court erred in failing to apply Japanese law. Therefore, we need not consider whether Japanese law was preferable to American law.

serted by an American corporation against a non-Swedish[5] vessel. *Cf. Gulf Trading,* 658 F.2d at 358. Aizawa has shown us no evidence of a strong policy in Swedish law regarding maritime liens in general. Nor has appellee demonstrated that the international maritime system is better served by Swedish rules than by American rules.

The effect of the parties' expectations is ambivalent at best. There is no reason to believe that Clover or Cardinal expected Swedish rather than American law to govern their dealings. Given that the charter called for performance in both hemispheres, Clover and Cardinal were at least as likely to anticipate that American law would control. Furthermore, the charter's incorporation of U.S. regulations in one technical area[6] and its reference to U.S. arbitration provide some evidence that the contracting parties intended American law to apply.

As to Aizawa itself, the company does not argue that it expected Swedish law to govern liens against the Seisho Maru when it first time-chartered the vessel. Such expectations could have arisen only when Aizawa's Master became aware of the Clover-Cardinal voyage charter. The evidence does not support a claim that the Master's expectations would have been any different from those of Cardinal and Clover.

The final factors—certainty, uniformity, and easy application—all favor American law in this case. Under Aizawa's view, Swedish law would apply to breaches of the charterparty while the Seisho Maru was still in Oxeloesund, but American law might kick in once the vessel reached Detroit or perhaps at some point in the Atlantic. Uncertainty about when American law became applicable and the resulting incongruity of legal rules would produce errant gusts disturbing the predictable tradewind of maritime law.

In sum, general choice-of-law principles as well as the relevant transactional contacts impel us to apply American law. We will follow the charts of the forum in navigating the rough seas ahead.

### 2. The Maritime Lien

■ The maritime lien is an ancient and unique feature of admiralty doctrine. It arises by operation of law to provide security to the victims of certain maritime torts and contract breaches. *See, e.g., The Barnstable,* 181 U.S. 464, 21 S.Ct. 684, 45 L.Ed. 954 (1901); *The Schooner Freeman v. Buckingham,* 59 U.S. (18 How.) 182, 188, 15 L.Ed. 341 (1855); 2 *Benedict on Admiralty* § 21, at 2 (7th ed. 1983); G. Gilmore & C. Black, *The Law of Admiralty* Chapter IX (2d ed. 1975) [hereinafter cited as *Gilmore & Black* ]. Plaintiffs bring an action directly against the vessel *in rem.* If they are victorious on the merits, they may enforce the judgment by condemnation and sale of the ship. *See* 2 *Benedict on Admiralty, supra,* § 21, at 2–3.

■ A maritime lien typically arises when the owner has breached its contract with the charterer. *See Rainbow Line v. M/V Tequila,* 480 F.2d 1024 (2d Cir.1973); *Belvedere v. Compania Plomari de Vapores,* 189 F.2d 148 (5th Cir.1951).

> [C]harterparties must, in the invariable regular course of . . . business, be made, for the performance of which the law confers a lien on the vessel.

*Rainbow Line,* 480 F.2d at 1027 (*quoting The Schooner Freeman v. Buckingham,* 59 U.S. (18 How.) at 190, 15 L.Ed. 341). The charterer may enforce its contract through an action *in rem.*

The vessel may also become open to maritime liens if the owner (or his Master) accepts cargo on board and signs a bill of lading evidencing a contract of affreightment with the shipper. Breach of that contract (e.g., by the loss of the cargo during the voyage) would subject the ves-

---

**5.** The Seisho Maru is a Japanese-flag vessel owned by a Japanese corporation.

**6.** Clause 42 required that the vessel's gear comply with "regulations established by U.S. Public Law 85–742 Part 9 (safety and health regula-

tions for longshoring)." These particular regulations are irrelevant to our case, but the reference to them is at least some indication of an intent that American law apply.

sel to *in rem* liability. *See The Capitaine Faure*, 10 F.2d 950, 954, 961 (2d Cir.1926); *Tube Products of India v. S.S. Rio Grande*, 334 F.Supp. 1039, 1041 (S.D.N.Y. 1971); *W. Poor, American Law of Charter Parties and Ocean Bills of Lading* § 10, at 33 (1968) [hereinafter cited as *Poor on Charter Parties*]; 2A *Benedict on Admiralty, supra*, § 35, at 4–19.

In the present case, however, no such bills of lading were issued, and the plaintiffs sue for a breach not of the head charter but of a subcharter to which Aizawa was not privy. Cardinal nevertheless argues that Aizawa entrusted the Seisho Maru to a time charterer and thereby assented to the creation of liens upon the vessel as security for the performance of the charterer's contracts of affreightment. As the Supreme Court stated in *The Schooner Freeman:*

> [W]hen the general owner intrusts the special owner with the entire control and employment of the ship, it is a just and reasonable implication of law that the general owner assents to the creation of liens binding upon his interest in the vessel, as security for the performance of contracts of affreightment made in the course of the lawful employment of the vessel. The general owner must be taken to know that the purpose for which the vessel is hired, when not employed to carry cargo belonging to the hirer, is to carry cargo of third persons; and that bills of lading, or charterparties, must, in the invariable regular course of that business, be made, for the performance of which the law confers a lien on the vessel.

59 U.S. (18 How.) at 190, 15 L.Ed. 341.

The Second Circuit has read this language to permit a maritime lien against the vessel when the charterer breaches its bill-of-lading contract with a shipper. *See United States v. S.S. Lucie Schulte*, 343 F.2d 897, 900 (2d Cir.1965) (shipper suing *in rem* to recover overcharges collected by

charterer). The same reasoning could be used to recognize a lien for the breach of a subcharter. *Cf. Gilmore & Black, supra,* at 668–69 (lien may arise if not "prohibited by an apt clause in the [head] charterparty"). Conceivably, even the breach of a sub-subcharter (like the Clover-Cardinal agreement) could give rise to liens, under the theory that the subcharterer (Clover) was entrusted with the use of the vessel.[7] And, if a subcharterer has authority thus to bind the vessel, why not a sub-subcharterer? The potential iterations of the theory are as multitudinous and repetitive as the chambers of the pearly nautilus.

We need not explore the full depths of those issues, however. Our case may be resolved on two narrower grounds. First, the lien cannot arise because it conflicts with Nakamura's right of withdrawal. Second, it is also barred by the Prohibition-of-Lien clause.

### (a) Right of Withdrawal

▮▮▮▮ Allowing a lien in this case would undermine Nakamura's right of withdrawal under its time charter. To clarify this point, we must provide some background information. Under the "executory contract doctrine," a maritime lien for breach of charterparty arises once (and to the extent that) cargo is loaded on board. *See Osaka Shosen Kaisha v. Pacific Export Lumber*, 260 U.S. 490, 43 S.Ct. 172, 67 L.Ed. 364 (1923); *Bulkley v. Naumkeag Steam Cotton*, 65 U.S. (24 How.) 386, 16 L.Ed. 599 (1860); *Belvedere v. Compania Plomari de Vapores*, 189 F.2d at 149–50; *The Capitaine Faure*, 10 F.2d at 961; *Gilmore & Black, supra,* § 9–22, at 637–38, § 9–23, at 639. The fanciful courts have envisioned a "union of ship and cargo," marking the commencement of the lien. *See Krauss Brothers Lumber v. Dimon S.S. Corp.*, 290 U.S. 117, 121, 54 S.Ct. 105, 106, 78 L.Ed. 216 (1933). Thus, even if the ship does not leave port with the cargo, it may be liable for a charter breach. The

---

**7.** After all, the head charter permitted Nakamura to subcharter the Seisho Maru and thereby give control over the vessel to a subcharterer.

468

Seisho Maru in this case discharged its cargo before leaving Oxeloesund; but because it had taken the steel coils on board for a few days, Cardinal argues that the discharge gave rise to a lien.

However, the cargo was unloaded because Nakamura was exercising its rights under the charter with Clover. Nakamura withdrew the vessel from the charter after Clover had failed to meet payment obligations. The charterparty expressly authorized a withdrawal under those circumstances. Clause 5 provides that if Clover fails to make

> the punctual and regular payment of hire, ... [Nakamura] shall be at liberty to withdraw the vessel from the service of [Clover], without prejudice to any claim [Nakamura] may otherwise have on [Clover].

Record at 167. Clause 49 is more specific:

> In default of prompt payment of the hire, or bank guarantee or deposit, or on any breach of this Charter, [Nakamura] shall notify [Clover] whereupon [Clover] shall rectify matters within three banking days of receipt of notification from [Nakamura], failing which [Nakamura] shall have the right to withdraw the vessel from the service of [Clover], without prejudice to any claim [Nakamura] may otherwise have on [Clover] under the Charter.

Record at 170. Under these terms, Nakamura was entitled to withdraw the Seisho Maru if Clover failed to meet its payments and if Nakamura gave the proper notice and allowed the appropriate grace period before acting. *See Schirmer Stevedoring v. Seaboard Stevedoring*, 306 F.2d 188, 189, 190, 191 (9th Cir.1962); *Diana Compania Maritima v. Subfreights of the S.S. Admiralty Flyer*, 280 F.Supp. 607 (S.D.N.Y.1968). Cardinal does not dispute that Nakamura met all of the procedural requirements and was entitled to withdraw the vessel.

Maritime law, however, required Nakamura to reland the cargo before effecting withdrawal of the vessel. As the Second Circuit declared in *Luckenbach v. Pierson*, 229 F. 130 (2d Cir.1915):

> [T]he withdrawal of a vessel from a charter party means that the owner shall deprive the charterer of any further enjoyment or use of the vessel and take it into his own exclusive possession. This can be presently done, even where the vessel is at sea, provided she is light; *but if there be any cargo on board no withdrawal can be made until the cargo be relanded if the vessel is at the loading port,* or until it be discharged if she is at sea or at destination. In the present case, when Luckenbach notified Pierson & Co. that he would withdraw the vessel on June 27th if the hire in arrear were not then paid, she was loading at Baltimore and he could have done so by relanding the cargo.

*Id.* at 132 (emphasis added); *Diana Compania Maritima v. Subfreights of the S.S. Admiralty Flyer*, 280 F.Supp. 607, 612 (S.D.N.Y.1968); 2B *Benedict on Admiralty, supra*, § 6, at 53 (citing *Luckenbach* as the leading case on this issue); *Poor on Charter Parties, supra*, § 8, at 28 (same). This rule serves to protect both the vessel owner[8] who is able to regain "control of his vessel" by discharging the cargo, *Diana Compania Maritima*, 280 F.Supp. at 613, and the cargo owner whose property will be unloaded at either of the two safest points—the loading port or the destination. The *Luckenbach* rule draws a reasonable line; once a vessel has put out to sea, she must continue the voyage and discharge her cargo before withdrawing from the charter.

If Cardinal were granted a lien in this case, however, it would directly conflict with the principles of *Luckenbach* and effectively torpedo the owner's right of withdrawal at the loading port. Once a charterer (in this case, Clover) allowed some cargo on board, the subcharterer's (or shipper's) lien would attach to ensure the carriage of the cargo. Even though the owner (or

---

**8.** Though Nakamura was not the ultimate owner of the vessel, it had the rights of the owner in this regard. Indeed, the charter referred to Nakamura as the "disponent owner."

"disponent owner" Nakamura)[9] had received no pay from its charterer and had entered into no agreements with the subcharterer, the owner could not reland the cargo. We are not prepared thus to sink the good ship *Luckenbach*. Cardinal is not entitled to a lien against the Seisho Maru.[10]

### (b) Prohibition-of-Lien Clause

■ The Prohibition-of-Lien clause in the two time charters provides an additional ground for rejecting a lien in this case. In *The Schooner Freeman*, the Supreme Court noted that it is "a just and reasonable implication of law that the general owner assents to the creation of liens" by the "special owner." 59 U.S. (18 How.) at 190, 15 L.Ed. 341. The general owner, however, can effectively negate that implication of assent by the inclusion of a clause prohibiting contract liens. *See The Valencia*, 165 U.S. 264, 17 S.Ct. 323, 41 L.Ed. 710 (1897); *The Kate*, 164 U.S. 458, 17 S.Ct. 135, 41 L.Ed. 512 (1896); *United States v. S.S. Lucie Schulte*, 343 F.2d at 900–901; *Gilmore & Black, supra*, § 9–39, at 668–69, § 9–46a, at 687–88.

Clause 18 of the Aizawa-Nakamura and Nakamura-Clover charters is the standard New York Produce Exchange provision, which has been enforced in a myriad of decisions. *See, e.g., Walsh Stevedoring v. M/S Slagen*, 361 F.2d 478, 479 (5th Cir. 1966); *Schilling v. A/S D/S Dannebrog*, 320 F.2d 628, 632 (2d Cir.1963). Most of the cases involved materialmen who had furnished repairs and supplies to a ship under charter. Those cases are not particularly enlightening here because they turn on a construction of the Maritime Lien Act, 46 U.S.C. § 971 *et seq.*, which specifically addresses materialmen's liens. *See infra*

at 470; *TTT Stevedores of Texas v. M/V Jagat Vijeta*, 696 F.2d 1135, 1139 and n. 2 (5th Cir.1983); *Walsh Stevedoring*, 361 F.2d at 479.

However, in *The Lucie Schulte*, the Second Circuit held that the Prohibition-of-Lien clause also limits a charterer's authority to subject the vessel to liens arising out of contracts of affreightment. 343 F.2d at 900–901. The shipowner (Schulte & Bruns) had time-chartered the S.S. Lucie Schulte to Three Bays Corporation. The charter contained exactly the same anti-lien provision as appears in our case.[11] Three Bays subsequently contracted with the United States Government to ship cargo on the Lucie Schulte. However, Three Bays overcharged its shipper. Eventually, the government discovered the error and brought an action *in rem* to recover the excess tariffs. The court held that the anti-lien clause in the head charter precluded a maritime lien against the vessel:

> Although the prime purpose of the clause may have been to trigger the pertinent provision of the Lien Act, we perceive no tenable ground for narrowing the broad language to materialmen's liens. Neither do we see any basis, either in policy or in authority, why an owner should be forbidden to protect himself against the creation of liens by a charterer under contracts of affreightment if he sufficiently brings the charterer's lack of authority home to the shipper.

343 F.2d at 901.

We agree that an owner should be able to shield himself against liens if he gives sufficient notice to shippers and subcharterers.[12] The question becomes whether the notice was sufficient—or, more precisely, whether the charterer, at the time it

---

**9.** Record at 167; *see supra* note 8.

**10.** Incidentally, the parties have cited—and our own research has dredged up—no cases in which a subcharterer obtained a lien because the owner had exercised its right of withdrawal at the loading port.

**11.** The charter provided:

Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

343 F.2d at 898.

**12.** We speak only of contract liens. The owner cannot use an anti-lien clause to prevent tort claimants from asserting a lien against the vessel. *See Gilmore & Black, supra*, at 668.

chartered the vessel, "knew, or by reasonable diligence could have ascertained," that the ship was already under charter and that the charter contained a Prohibition-of-Lien clause. *The Kate,* 164 U.S. at 470, 17 S.Ct. at 140; *The Lucie Schulte,* 343 F.2d at 901. The party entering a contract has a duty of inquiry. *See Gilmore & Black,* at 672, 687–88. If he later seeks a lien for breach of that contract, he must meet the burden of showing that diligent inquiry would not have informed him of the higher charter or the anti-lien clause. *See The Lucie Schulte,* 343 F.2d at 901. The trial court found nothing in the record before it to indicate that Cardinal did not know and could not by reasonable diligence have discovered the Nakamura-Clover charter or Clause 18. Thus, Cardinal failed to bear its burden of proof on this matter.

Cardinal responds, however, that the rule of *The Lucie Schulte* should no longer apply. It points out that Congress amended the Maritime Lien Act in 1971, repealing a provision that required materialmen to exercise due diligence in ascertaining the terms of the ship's charterparty. *See* Pub.L. No. 92–79 (1971), amending 46 U.S.C. § 973. Cardinal argues that that amendment undermines the reasoning of *The Lucie Schulte.*

We disagree. The amendment certainly affected the power of the *materialman* to acquire a maritime lien, *see Atlantic and Gulf Stevedores v. M/V Grand Loyalty,* 608 F.2d 197, 201–202 n. 7 (5th Cir.1979); but it had no effect on other contractors. The Maritime Lien Act delineated the rights only of materialmen. When enacted in 1910, it may have subsumed (and perhaps modified[13]) more ancient principles respecting maritime liens. However, it has never purported to govern the shipper's or subcharterer's lien. *See Gilmore & Black, supra,* at 687. Thus, the amendment in 1971 had no direct bearing on the effectiveness of a Prohibition-of-Lien clause vis-a-vis the claim of a subcharterer.

Moreover, the legislative policy supporting the amendment has much less force in the case of non-materialmen. The House Report on the 1971 bill pointed out that the materialman needs protection from anti-lien clauses because he works under great time pressure and usually does not have time to investigate the authority of a charterer:

> Testimony at the hearings on the bill would indicate that this problem is primarily encountered with foreign-flag vessels chartered to foreign operators. In order to protect themselves, the American materialman must ascertain whether a vessel requesting necessaries is under charter and if so, whether the charter contains a "no lien provision." Alternatively, he can make a credit check on the financial responsibility of the vessel operator. Generally, a vessel requiring necessaries is unable to give sufficient notice so that the American materialman can do either, and he usually ends up assuming the risk that his bill will be paid.

> .    .    .    .    .

> After careful consideration of the entire record, your Committee has concluded that, as a matter of equity, the owner should bear the loss in such a situation.

> As a practical matter, the owner can more easily protect himself contractually by bonds or otherwise at the time he charters the vessel, than the American materialman who furnishes necessaries to a vessel under great economic pressure to put back to sea.

H.R.Report No. 92–340, *reprinted in* 1971 *U.S.Code Cong. & Ad.News,* 92nd Cong., 1st Sess., 1363, 1364, 1365. A would-be charterer, by contrast, is under much less time pressure and has earlier notice of his need to obtain a vessel. Consequently, he has greater freedom to conduct an adequate inquiry. Furthermore, the corporations that typically charter vessels are more sophisticated and have greater resources to devote to an investigation than has the local materialman. *Cf. The Lucie Schulte,* 343 F.2d at 901. As between a shipowner, charterer and subcharterer, it is not so obvious that the owner should bear all risks. Permitting a contractual allocation of risks between these parties is much

---

**13.** *See Gilmore & Black, supra,* § 9–44, at 677 (specific form of anti-lien clause required).

more equitable than in the case of shipowner and materialman.

The Prohibition-of-Lien clause still serves a valid purpose. It encourages freer trade in the chartering and subchartering of vessels. Owners will be more likely to permit their charterers to enter freely into contracts of affreightment if the owners know that no "secret liens" will arise from obscure provisions in sub-agreements.

More important, the duty of inquiry that has been placed on shippers and charterers still serves a valid goal. It prevents them from "shutting their eyes" to facts that they could easily discover. *See Gilmore & Black, supra,* at 672. Because there are no strong counterreasons for shielding these parties from such an obligation, we hold that the rule of *The Lucie Schulte* is still binding.

Thus, Cardinal had the burden of showing that a reasonable inquiry would not have brought the anti-lien clause to surface. It failed to meet that burden, so its lien must likewise fail. The judgment of the trial court is

AFFIRMED.

----------------

Now, leaving Oxeloesund, Sweden, we return to the treacherous Atlantic and point our bow to the south. We are bound to round the Cape of Good Hope and set sail for the fabled Orient—our destination: Djakarta, Indonesia.

## II. THE GOVERNMENT OF THE REPUBLIC OF INDONESIA AND BANDAN URUSAN LOGISTIK v. M/V GLAFKOS AND GLAFKOS SHIPPING

This case, like the preceding one, involves a veritable Jacob's ladder of interlocking charters and sub-charters. Glafkos Shipping Company, Ltd. ("Glafkos Shipping") owns the M/V Glafkos. The company time-chartered the Glafkos to Forestships International Ltd. ("Forestships") for a term of eight to eleven months. Forestships subsequently time-chartered the vessel to Claybridge Shipping Co. S.A. ("Claybridge") for "one time chartered trip." Both of these charters were on the New York Produce Exchange form and contained "Clause 18", the Prohibition-of-Lien provision.[14]

They also provided that Glafkos Shipping would appoint the Master of the ship, who was to authorize charterers to issue bills of lading on his behalf. Amendment 33 to the Glafkos Shipping-Forestships Charter provided:

> The Master to authorize in writing the Charterers and/or their Agents to sign Bills of Lading on his behalf. Bills of Lading to be signed by the Charterers and/or their Agents only if in conformity with the Mate's Receipts.[15]

On December 3, 1979, Claybridge substituted the M/V Glafkos for the M/V Pamela, which it had previously chartered to the Government of the Republic of Indonesia ("Indonesia") under a voyage charter dated November 15, 1979. The terms of the voyage charter continued to apply, except that the Glafkos was now the vessel to be used by Indonesia.

The charter made the Glafkos available for a single voyage to carry rice from the southern United States to Indonesia. Freight was to be paid by the Indonesian government to Claybridge on the basis of a calculated price per ton of cargo. Indone-

---

**14.** Again, the clause provides:

18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

**15.** Amendment 41 to the Forestships-Claybridge charter provided:

If required by Charterers and/or their Agents, Master to authorize Charterers or their Agents to sign Bills of Lading provided in accordance with tally clerks and/or mates receipts.

Record at 93.

sia also agreed to pay Claybridge demurrage of $8,500 per day, and Claybridge agreed to pay Indonesia dispatch of $4,250 per day.[16] Clause 6 of the charterparty provided: "Vessel to have a lien on the cargo for all freight, dead freight, demurrage or average."

Badan Urusan Logistik ("Bulog") was the consignee of the rice cargo. According to the affidavit of Frederick Toding, a Bulog representative, "the M/V Glafkos carried 509,263 bags of rice between Lake Charles, Louisiana, and [Djakarta], Indonesia in early 1980 pursuant to [the voyage charter]." Bills of lading covering the shipment were issued (apparently to the shipper, the East Asiatic Company[17]). Lake City Stevedores, agents of Claybridge, signed the bills "For the Master." The bills expressly incorporated the terms of the "covering charter party":

> All terms, conditions and exceptions as per covering charter party and any addenda thereto, to be considered as incorporated herein as if fully written; anything to the contrary contained in this bill of lading notwithstanding.

The Louisiana rice arrived in Djakarta in February, 1980. However, Indonesia and Bulog contend that the cargo was damaged. In addition, they allege that 23 days, 22 hours, and 57 minutes were saved by rapid loading and discharge of the cargo, entitling the plaintiffs to $101,814.05 in dispatch money.

Unfortunately, Claybridge filed for bankruptcy in the spring of 1980, before the plaintiffs could collect. Therefore, Indonesia and Bulog brought an action for cargo damage and dispatch against Glafkos Shipping, Claybridge, and Kontozamis Shipping (an alleged agent of Glafkos Shipping) *in personam*. They also brought an action *in rem* against the M/V Glafkos, asserting a maritime lien. After the case was filed in district court, the plaintiffs settled their claim for cargo damage. In addition, the trial court dismissed Claybridge and Kontozamis as parties defendant. Thus, the only remaining issues concern the claim for dispatch brought against Glafkos Shipping and its vessel. On September 10, 1982, Glafkos Shipping filed a Motion for Summary Judgment, seeking to dismiss the dispatch claim. The plaintiffs filed a Cross-motion for Summary Judgment, seeking enforcement of the claim. The court granted the defendant's motion on the ground that plaintiffs could assert no lien against the vessel. 553 F.Supp. 272. The plaintiffs have appealed from that judgment.

Again, the central question on appeal is whether a lien could arise under these circumstances. Glafkos Shipping also contends that if the lien was invalid, then the plaintiffs are liable for attorney's fees as damages resulting from the wrongful seizure of the Glafkos. We hold that the Prohibition-of-Lien clause precludes the lien, but that Glafkos Shipping is not entitled to attorney's fees.

## A. The Lien

■ If a lien could be asserted in this case, it would arise under an argument similar to that outlined in *Cardinal Shipping v. M/S Seisho Maru*. Claybridge was entrusted with the use of the *Glafkos*. Therefore, it could arguably enter into a contract of affreightment subjecting the vessel to maritime liens. *See The Schooner Freeman v. Buckingham*, 59 U.S. (18 How.) at 190, 15 L.Ed. 341; *The Lucie Schulte*, 343 F.2d at 900. Claybridge's failure to pay dispatch would, then, amount to

---

16. Demurrage is compensation of the "shipowner" for days that the ship lies useless at port because loading or unloading of cargo has proceeded more slowly than expected. Dispatch is the complementary payment to the charterer for loading or unloading the ship more rapidly than expected. Under the terms of the Claybridge-Indonesia charter, the parties agreed that loading and discharge would proceed at a minimum rate of 1,000 metric tons per working day (700 tons per working day if the discharge port were Cirebon).

17. The history of these bills of lading is none too clear. The plaintiffs-appellants refer to the bills only in their Reply Brief and without giving any discussion of their issuance, transfer, or presentment. All that we know is gleaned from the face of the documents.

a breach of the charter, entitling the plaintiffs to a lien. As in *Cardinal Shipping* and *The Lucie Schulte*, however, the first question becomes whether the anti-lien clause in the time charters effectively stripped Claybridge of the power to incur liens.

Claybridge attempts to avoid this reef by taking a broader reach and characterizing the dispatch obligation as one arising initially between the vessel and the cargo owner. The anti-lien clause only bars liens incurred by the charterer (or his agents). Claybridge argues that the vessel itself incurred the lien in the first instance, and, therefore, that Clause 18 does not apply. Claybridge relies on *The Corvus*, 282 F. 939 (D.Md.1922), *aff'd*, 288 F. 973 (4th Cir. 1923), in which the district court [18] concluded that contractual obligations for dispatch and demurrage are "reciprocal" in the sense that the party who would pay demurrage is also the proper recipient of dispatch when it is earned. 282 F. at 940. The owners [19] of the vessel had entered into a voyage charterparty with Universal Transportation Company ("Universal" or "charterer"). The charter contemplated the carriage of coal for one voyage and provided that the owners could collect demurrage if the vessel were held too long in port. On the other hand, the charter provided that the owners would pay dispatch if the vessel were unloaded more quickly than expected.

The cargo was shipped, dispatch was earned, and the consignee [20] brought an action *in rem* to recover the dispatch amounts due. At trial, a question arose about who was entitled to the dispatch—the charterer or the consignee. The court concluded that the consignee had the right to collect dispatch because it would have been liable for demurrage.[21] It was entitled to a lien in the action because the shipowners had breached their charter. *Id.*

Nothing in the case suggests that the plaintiff would have a lien if the shipowner had not contracted to pay dispatch. The mere fact that the owner has a right to demurrage, even one secured by a lien on the cargo, does not automatically give a right to dispatch. There must be a contractual agreement to pay the dispatch.

Moreover, the case does not hold that every right to dispatch confers a lien. It merely holds that where the owner has breached his own contract for dispatch, a lien arises. Thus, *The Corvus* does not govern our case. Claybridge undertook the dispatch obligation in a subcharter to which Glafkos Shipping was not a party. There is no evidence that the shipowner was even aware of the agreement. If a lien arose at all, it arose by virtue of the charterer's arguable authority to bind the ship to contracts of affreightment. *See The Lucie Schulte*, 343 F.2d at 900.[22]

**18.** The Court of Appeals affirmed the trial court on this issue, 288 F. at 974, but the basic reasoning is stated in the district court opinion.

**19.** Oddly, neither opinion names them.

**20.** Direzione Generale Combustilibi.

**21.** The charterparty expressly provided a lien on the cargo for demurrage.

**22.** The plaintiffs also urge that a lien arose from the breach because bills of lading were signed "For the Master" by Lake City Stevedores. The bills expressly incorporated the covering charter—including presumably the voyage charter and its dispatch terms. Therefore, Claybridge contends that the owner (through its agents) signed and became a party to bills of lading containing those terms. *See The Capitaine Faure*, 10 F.2d 950, 954 (2d Cir.1926); *Poor on Charter Parties, supra*, § 10, at 33.

The weakness in this argument is that Claybridge has never proved the agency. Clause 33 of the Glafkos Shipping-Forestships time charter provided that charterers would be authorized to sign bills of lading for the Master if the Master gave authorization in writing. *See Record* at 81. We can find no evidence in the record—nor have the plaintiffs contended in their pleadings at trial or on appeal—that the Master gave such authorization. Claybridge has the burden of proving authority to sign the bills for Master and owner. *See Associated Metals & Minerals v. SS Portoria*, 484 F.2d 460, 462 (5th Cir.1973). It failed to meet that burden.

Of course, some cases have held that even if a signature "For the Master" is not authorized, the bills may be "ratified" when cargo is loaded and shipped aboard the vessel. At that point, a breach of the terms in the bills of lading may give rise to a lien against the vessel. *See Demsey & Associates v. SS Sea Star*, 461 F.2d 1009, 1015 (2d Cir.1972); *Tube Products of India v.*

Thus, the currents of inevitability drive us back upon the reef that the plaintiffs hoped to skirt. We must ask whether the anti-lien clause in the Glafkos Shipping-Forestships charter and the Forestships-Claybridge charter precludes the plaintiffs' action against the vessel. The clause in each charter is the same New York Produce Exchange provision that we held to be effective in *Cardinal Shipping*. Here, as in *Cardinal*, the clause appeared in the time charters under which Claybridge took possession of the vessel. Therefore, the question becomes whether the plaintiffs knew or could have ascertained that the Glafkos was under charter and that the charter contained a Prohibition-of-Lien clause. The plaintiffs have the burden of proving that diligent inquiry would have been unavailing. *See supra* at 471.

Again, they have failed to put forward any convincing evidence on this score. Their sole argument is that the Glafkos Shipping-Forestships charter was expressly secretive. Amendment 70 to that charter provides: "This fixture to be kept strictly private and confidential." Record at 85. The plaintiffs claim that diligent inquiry could not have discovered such a confidential document.

They have not argued, however, that the Forestships-Claybridge subcharter contains a similar "secrecy clause." Nor can we find one. Thus, they have given no reason why they could not discover the anti-lien provision contained in the subcharter. Awareness of that clause alone would have been sufficient to put the plaintiffs on notice as to the constraints on Claybridge's authority. This is particularly true since Claybridge was the very "Charterer" referred to in Clause 18 of that subcharter. In sum, plaintiffs did not sufficiently carry

their burden of proof. Clause 18 bars their purported lien.

### B. Attorney's Fees

■ Glafkos Shipping brings a cross-appeal seeking attorney's fees on the ground that Indonesia and Bulog wrongfully seized the Glafkos.[23] The shipowner argues that such fees are a basic element of damages for the tort of wrongful seizure.

Without deciding whether there was a wrongful seizure, we hold that the claim for attorney's fees is unsupported. In order to collect fees, the plaintiff must prove that the party seizing the vessel acted in bad faith, with malice, or with wanton disregard for the rights of his opponent. *See Frontera Fruit v. Dowling*, 91 F.2d 293, 297 (5th Cir.1937); *see also Platoro Ltd. v. Unidentified Remains of a Vessel*, 695 F.2d 893, 905–906 (5th Cir.1983); *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 730–31 n. 5 (5th Cir.1980). The pleadings of Glafkos Shipping did not allege, and the company has not proven, any acts of bad faith, wantonness, or malice on the part of Indonesia and Bulog.

The owner argues that the Supreme Court did not require bad faith in awarding fees in *The Apollon*, 22 U.S. (9 Wheat) 362, 372, 6 L.Ed. 111 (1824); *see also Ocean Ship Supply v. M/V Leah*, 1982 A.M.C. 2740, 2751 (C.D.S.C.1982). It contends that the Court recently explained *The Apollon* as drawing a line between fees awarded as "costs" and those awarded as "damages," bad faith not being required for the latter. *See Vaughan v. Atkinson*, 369 U.S. 527, 530, 82 S.Ct. 997, 999, 8 L.Ed.2d 88 (1962) (discussing attorney's fees in the context of a seaman's suit for maintenance and cure). The *Vaughan* court, however, never explicitly declared that bad faith was not required; on the contrary, it emphasized that

---

*S.S. Rio Grande*, 334 F.Supp. 1039, 1041 (S.D.N.Y.1971); *United Nations Children's Fund v. S/S Nordstern*, 251 F.Supp. 833, 837 (S.D.N.Y.1965). However, this liability is but a variant of the charterer's ability to bind the vessel to contracts of affreightment. Thus, his authority may be constrained by a Prohibition-of-Lien clause. *See The Lucie Schulte*, 343 F.2d at 898 (breach

of bill-of-lading contracts); *Gilmore & Black, supra*, at 687.

**23.** Glafkos Shipping sought attorney's fees in the trial court. *See* Defendant's Answer, Record at 43. The court ordered Indonesia and Bulog to post bond to secure the wrongful seizure claim, but it never ruled on that claim.

the defendant had been "callous ... willful and persistent" and that his "recalcitrance" had forced the plaintiff "to hire a lawyer and go to court to get what was plainly owed him." *Id.* at 530–31, 82 S.Ct. at 999–1000; *Gilmore & Black, supra,* at 313. This Court has read *Vaughan* to require bad faith, *see Noritake,* 627 F.2d at 731 n. 5, and we have required bad faith or malice long since *The Apollon* was decided. *See Frontera Fruit; Platoro Ltd.; Noritake.*

In this case, there was a bona fide dispute over the validity of Indonesia's and Bulog's lien. Given the scarcity of Fifth Circuit precedent in this area, the parties could have legitimately and honestly believed that a lien would stand up. There is no evidence of wantonness, bad faith, or malice. Thus, the record does not support an award of attorney's fees.

Glafkos Shipping may sail away on its vessel but not with the lienors' dollar nailed to the mast.

AFFIRMED.

ALVIN B. RUBIN, J., concurring:

Bound by the decision in *Frontera Fruit Co., Inc. v. Dowling,*[1] I concur in the denial of attorney's fees as well as in the remainder of the opinion. A half century ago, in that case, we denied damages for wrongful libel of a vessel save when the seizure resulted from bad faith, malice, or gross negligence.[2] Incidental thereto, on the same grounds we denied recovery for attorney's fees incurred in obtaining the release of the vessel seized, without differentiating between attorney's fees and other damages. The sum sought for fees was only $300. Now, securing release of a vessel may occasion the payment of attorney's fees in amounts never dreamed of in 1937. It is time to reconsider whether wrongful seizure, even if provoked in good faith, should not entail liability for attorney's fees, by statute if need be. Those who, like seamen, are exempt from providing security, should, of course, retain their privileged status.

1.  91 F.2d 293 (5th Cir.1937).

Lawrence John STOKES, Petitioner-Appellant,

v.

Raymond K. PROCUNIER, Director, Texas Department of Corrections, Respondent-Appellee.

No. 83–2481.

United States Court of Appeals, Fifth Circuit.

Oct. 22, 1984.

2.  *Id.,* 91 F.2d at 297.

Jerry Warren, Rain, Harrell, Emery, Young & Doke, Dallas, Tex., for petitioner-appellant.

Jim Mattox, Atty. Gen., Charles A. Palmer, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before RUBIN, REAVLEY, and TATE, Circuit Judges.

REAVLEY, Circuit Judge:

Lawrence John Stokes, who is on parole under the custody of the State of Texas, appeals the denial of habeas corpus relief under 28 U.S.C. § 2254. *See Jones v. Cunningham*, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963). He was convicted of attempted burglary in 1973 and, because of two prior convictions, received an enhanced sentence of life imprisonment. After Stokes unsuccessfully challenged his conviction in state court, he filed this action in federal district court. The district court referred two claims—improper comment on Stokes' post-arrest silence and ineffectiveness of counsel—to a magistrate for a hearing. After adopting his findings and conclusions, the court dismissed the cause

with prejudice, but issued a certificate of probable cause. We affirm in part and reverse in part.

## I. Case History

Sheila Shumaker returned to her home in Beaumont, Texas, on the afternoon of January 6, 1973, and observed a man wearing white gloves, trying to open the patio door from the outside with what she thought was a screwdriver. She asked him what he was doing, and he ran off. Then she called the police, providing a description of the man. A neighbor of the Shumakers saw a man running on a service road behind his house.

After receiving a radio call about the incident, a police officer saw a man matching the description in the area, about seven blocks from the Shumaker residence. When asked what he was doing, the man first said that he was visiting friends, although he could not name them. He then said he was looking for a lost dog, but, when asked, could not say where he lost the dog or identify any street names in the neighborhood. The police officer then arrested Stokes, finding a pair of white gloves and a screwdriver in a pocket of his sport coat. The police officer drove to the Shumaker residence, and Sheila viewed Stokes sitting in the police car. Although she thought the man outside the house had lighter hair than the man in the car, she observed that the man in the car wore a similar jacket, was of the same race and age, and generally resembled the man she had seen earlier. The neighbor identified the man in the police car as the same man he saw running earlier.

The jury found Stokes guilty of attempted burglary with intent to commit theft. Then, in the punishment phase of trial, the prosecution introduced "pen packets" and fingerprint evidence establishing that Stokes had previously been convicted of two felonies. The jury found that the prosecution had proved beyond a reasonable doubt, as charged in the indictment, that Stokes had previously been convicted of two felonies less than capital. According-

ly, the court sentenced Stokes to life imprisonment as a habitual offender under Tex.Penal Code Ann. Article 63 (Vernon 1925) (repealed 1974) (current version at Tex.Penal Code Ann. § 12.42(d) (Vernon 1974 & Supp.1984) ).

## II. Receipt of Indictment

Stokes first challenges his 1973 conviction on the basis that he did not receive a copy of the indictment. He argues that the failure to provide an accused with a copy of the indictment violates Texas law, *see* Tex. Crim.Proc.Code Ann. art. 25.01 (Vernon 1966), and the Sixth Amendment. Our inquiry, however, is limited to ascertaining whether Stokes was deprived of any right guaranteed by the United States Constitution. He would be entitled to relief if he had not been informed of the nature and cause of the accusation against him or if he was unable to plead the judgment as res judicata against any attempted prosecution for the same offense. *See, e.g., Calley v. Callaway*, 519 F.2d 184, 226 (5th Cir.1975) (en banc), *cert.denied*, 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976); *United States v. Strauss*, 283 F.2d 155, 158–59 (5th Cir.1960).

■ The record contains a Precept to Serve Copy of Indictment, which shows that Stokes was served with a certified copy of the indictment on April 19, 1973, well before he was tried in August 1973. Moreover, the hearing before the magistrate revealed that Stokes' trial counsel's file contained a copy of the indictment. Although counsel could not specifically remember whether he obtained a copy of the indictment before trial, his normal procedure was to do so immediately after being appointed. He also testified that he discussed the charges in detail with Stokes. Stokes' Sixth Amendment right to be informed of the charges so that he could prepare a defense was not violated.

## III. Evidence of Intent to Commit Theft

■ Stokes argues that insufficient evidence existed upon which a rational trier of fact could conclude beyond a reasonable

doubt that he possessed the intent to commit theft, an essential element of the crime for which he was convicted. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Greer v. State,* 437 S.W.2d 558 (Tex.Crim.App.1969). We disagree. A rational trier of fact could have found, by inference from the circumstantial evidence introduced, that Stokes had the requisite intent. *See, e.g., Williams v. Maggio,* 695 F.2d 119, 122 (5th Cir.), *cert. denied,* 461 U.S. 917, 103 S.Ct. 1901, 77 L.Ed.2d 288 (1983); *United States v. Haldeman,* 559 F.2d 31, 115–16 (D.C.Cir. 1976) (en banc), *cert.denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Hall v. United States,* 286 F.2d 676, 677, 679 (5th Cir.1960); *Williams v. State,* 537 S.W.2d 936, 938 (Tex.Crim.App.1976); *Warren v. State,* 641 S.W.2d 579, 582 (Tex.App. —Dallas 1982, pet. dism'd).

Sheila Shumaker testified that she observed a man wearing white gloves using a screwdriver to "jimmy open" the patio door at the rear of her house. He fled when she inquired what he was doing. A neighbor who saw a man running away testified, "His hands seemed to be white as if he had something on his hands." The police officer arrested a man fitting the description given over the radio and supplied by Sheila. He possessed a screwdriver and lightweight white gloves and gave two explanations for his presence in the neighborhood, which he later admitted were false. The neighbor identified him as the same man he had seen running. Based on this evidence, the jury could have concluded beyond a reasonable doubt that Stokes used the screwdriver with intent to steal something from the Shumaker house and that he wore the white gloves to avoid leaving fingerprints.

## IV. Prosecutorial Comments on Stokes' Post-Arrest Silence

On direct examination at the trial the police officer related the circumstances surrounding Stokes' arrest. He stated that he made the arrest after Stokes told him that he in fact had not lost a dog and could not produce identification. The following colloquy between the prosecutor and police officer ensued:

Q. Officer Gratzer, at the time that you took him into custody did you advise him of the reason that you were placing him in custody and also advised him of the rights that are required under the law?

A. Yes, sir, I did.

Q. And after advising him of the reason you were arresting him did he tell you anything else?

A. No, he did not.

Defense counsel made no objection to the latter question. On cross examination, Stokes' attorney asked:

Q. Officer, have you ever talked to anyone when you were investigating an offense or an alleged offense and ordinary people—do they ever appear nervous in your presence?

A. Yes, they do.

Q. So, it isn't unusual for someone to be hesitant in talking or not clear about what they have to say, is it? We are not talking about this individual in this case, but in performing routine investigations it is not unusual, is it, officer, to talk with someone who is hesitant or is confused about details?

A. No, sir.

On redirect, the prosecutor inquired:

Q. Did [Stokes] subsequently tell you, in fact, that there was no dog lost and that wasn't why he was there?

A. Yes, sir.

Q. Now, what is of great importance, I think, in line with what Mr. Boudreaux asked you, his contention that people are nervous, after you told the defendant that you were placing him in your custody for attempted burglary of a house down the street from that point on, or at that very moment, from that point on he never said a word?

A. He wouldn't answer any more questions.

Again, defense counsel failed to object. Boudreaux then examined Gratzer on recross:

Q. Officer, is it—would it be unusual if you tell someone you are arresting them for some crime for them not to make any further statement?

A. Yes, sir.

Q. That's not unusual, is it?

A. It is unusual.

Q. It is unusual?

A. Yes, sir.

Q. Are you telling me and this jury that in the course of your duties when you arrest someone, at that point they make no further statements?

A. Normally they do make further statements.

Q. You've never known anyone to become afraid and keep their mouth shut, officer, and not say anything further?

A. Yes, it has happened.

Q. But this is not unusual?

A. No.

Q. Officer, would you expect that whenever you walk up to someone on the street in conducting an investigation would you feel that they have a duty to talk to you?

MR. GIST: Your Honor, I object to that. That's improper.

THE COURT: Sustained.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court stated that "it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation." *Id.* at 468 n. 37, 86 S.Ct. at 1625 n. 371; *see United States*

*v. Hale*, 422 U.S. 171, 182–83, 95 S.Ct. 2133, 2139–40, 45 L.Ed.2d 99 (1975) (Douglas, J., and White, J., concurring). In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Court extended this principle of *Miranda* to the cross examination context, holding that a defendant's post-arrest silence could not be used to impeach his exculpatory story without violating due process.

Although Stokes raised the issue of improper prosecutorial comment on direct appeal, the Court of Criminal Appeals did not discuss it in the opinion affirming his conviction. The Texas courts denied Stokes' petition for habeas relief without opinion.

The district court referred the issue of improper comment on Stokes' post-arrest silence to the magistrate for a hearing and findings. The magistrate made alternative findings, which the district court adopted. First, because of defense counsel's failure to object, review of the claim was barred by *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Second, the violation was harmless beyond a reasonable doubt. *See, e.g., United States v. Shaw*, 701 F.2d 367 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984); *Chapman v. United States*, 547 F.2d 1240 (5th Cir.), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977).

If defense counsel had not explored with the arresting officer possible reasons for Stokes' post-arrest silence, we do not doubt that the prosecutor would not have emphasized the silence as extensively as he did on redirect and during final arguments.[1]

---

1. [T]he officer said, "Mr. Stokes, I'm arresting you for the attempted house burglary that occurred right down the street." And you know what he said then? Nothing. No more stories. No nothing. Nothing. And never said another word, and that ought to indicate to you and confirm what I suggested to you all along, is that a professional burglar knows when he's in the box, and from that point on the professional did just what—

    MR. BOUDREAUX: Your Honor, we're going to object to that. Counsel needs to stay within the Record.

    THE COURT: Overruled.

    MR. BOUDREAUX: Note our exception.

BY MR. GIST:

    He was caught, and he did just what everybody does that is in the business—bite your lip and just keep your mouth shut. Do what the lawyers tell you to do. Don't tell those policemen nothing once they got you. Don't say a word.

    He could have said, were it so, "I was here visiting a lady friend." He could have said, "My car broke down." He could have said, "I'm a doctor." "I'm a bus driver looking for my bus." He could have said anything. He could have said, "I don't know what you are

Nevertheless, the prosecutor in his case-in-chief initiated the comment on Stokes' silence by asking if he had said anything else after he was arrested and advised of his rights. "In numerous cases this Court has held that mention of the fact of the defendant's silence following arrest by the prosecutor in his case-in-chief is a violation of constitutional dimension." *Shaw,* 701 F.2d at 381.

Because the state court did not specify whether it denied habeas relief on the merits or due to procedural default, we must interpret the state court's silence. *See O'Bryan v. Estelle,* 714 F.2d 365, 383–85 (5th Cir.1983); *Preston v. Maggio,* 705 F.2d 113 (5th Cir.1983). We must consider

> [w]hether the court has used procedural default in similar cases to preclude review of the claim's merits, whether the history of the case would suggest that the state court was aware of the procedural default, and whether the state court's opinions suggest reliance upon procedural grounds or a determination of the merits.

*O'Bryan,* 714 F.2d at 384 (quoting *Preston* ).

■ Our investigation into Texas cases reveals that Texas courts have consistently refused to consider the merits of claims similar to this in cases where counsel failed to object and where counsel failed to object properly. Texas courts have not reached the merits of *Miranda* violations because of the failure of counsel to object contemporaneously. *See, e.g., Moulden v. State,* 576 S.W.2d 817 (Tex.Crim.App.1978); *Shumake v. State,* 502 S.W.2d 758 (Tex.Crim. App.1973); *Larocca v. State,* 479 S.W.2d 669 (Tex.Crim.App.1972); *Clark v. State,* 470 S.W.2d 869 (Tex.Crim.App.1971). Texas courts have also construed the failure to object as waiver of a *Doyle* claim, *Greene v. State,* 651 S.W.2d 948, 951–52 (Tex.App. —Dallas 1983, pet. granted) (en banc), and have held that the contemporaneous objection requirement applicable to a *Miranda* claim also applies to an allegation of a *Doyle* violation, *Wilkins v. State,* 635

S.W.2d 444, 448–49 (Tex.App.—San Antonio 1982). Even before *Doyle,* the Court of Criminal Appeals had read *Miranda* to prohibit prosecutorial comment about the silence of an accused during arrest. *See Hawk v. State,* 482 S.W.2d 183, 184 (Tex. Crim.App.1972). Moreover, well before *Miranda* Texas law did not permit the use of a defendant's silence at the time of his arrest as a circumstance indicating guilt. *See, e.g., Hicks v. State,* 493 S.W.2d 833, 836–37 (Tex.Crim.App.1973); *Redding v. State,* 149 Tex.Cr.R. 576, 197 S.W.2d 357 (1946); *Taylor v. State,* 118 Tex.Crim. 340, 42 S.W.2d 426 (1931). At the time of Stokes' trial, the grounds for objection to prosecutorial comment on the post-arrest silence of a defendant were apparent. Thus, this case does not present an exception to the rule that failure to object constitutes waiver. *See O'Bryan,* 714 F.2d at 385 n. 15; *Green v. Estelle,* 706 F.2d 148 (5th Cir.); *Bass v. Estelle,* 705 F.2d 121 (5th Cir.1983) (opinion denying petition for rehearing); *Parker v. State,* 649 S.W.2d 46, 53–55 (Tex.Crim.App.1983) (en banc); *Cuevas v. State,* 641 S.W.2d 558, 563 (Tex. Crim.App.1982).

We note that the State's supplemental brief on direct appeal argued that the issue of comment on Stokes' post-arrest silence was not preserved for review. Accordingly, we conclude that the state court was aware of the procedural default.

Stokes has argued only ineffective assistance of counsel as "cause" to excuse the failure to object. This is insufficient to satisfy *Sykes'* "cause" prong. *See, e.g., Weaver v. McKaskle,* 733 F.2d 1103, 1106 (5th Cir.1984); *Washington v. Estelle,* 648 F.2d 276, 278 (5th Cir.), *cert. denied,* 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981). Because we hold that Stokes' procedural default prevents our hearing his claim on the merits, we need not address whether the improper comment on his post-arrest silence constitutes harmless error.

## V. One-Man Showup

Stokes contends that he did not receive a fair trial because of a pretrial identification

---

talking about." He said nothing. Never a word.